IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA

| | |
|---|---|
| NU PAGAMENTOS S.A.<br>Plaintiff/Counter-Defendant<br><br>and<br><br>DOES 1-10<br>Counter-Defendants<br><br>v.<br><br>GEORGE DANIEL HUDSON JR.<br>Defendant/Counter-Plaintiff | Case No. 2:21-cv-00069-RWS |

## DEFENDANT'S ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIMS WITH JURY DEMAND

Defendant/Counter-Claimant George Daniel Hudson Jr. ("Defendant" or "Counter-Claimant" or "Hudson") hereby responds to Plaintiff's ("Nu Pagamentos" or "Counter-Defendant")[1] Complaint. Defendant also asserts affirmative defenses and asserts a series of counterclaims against Plaintiff and Does 1-10.

### Jurisdiction and Venue

1.     Defendant does not challenge subject matter jurisdiction.

2.     Defendant does not challenge personal jurisdiction.

3.     Defendant does not challenge venue.

---

[1] Nu Pagamentos inaccurately refers to itself as "Nubank" throughout its Complaint, despite Defendant Hudson being the legal owner of the trademark "Nubank." For purposes of this matter, Defendant will refer to the parties by their lawful names.

1

**The Parties**

4.      Defendant is without sufficient knowledge or information to form a belief as to the truth of the allegations. To the extent a response is required, the statements of that paragraph are denied.

5.      Defendant admits that he is a current resident of Georgia.

**Factual Background**

6.      Defendant is without sufficient knowledge or information to form a belief as to the truth of the allegations. To the extent a response is required, the statements of that paragraph are denied.

7.      Defendant admits and agrees that Plaintiff began doing business in Brazil around 2014. Defendant is without sufficient knowledge or information to form a belief as to the truth of the other allegations. To the extent a response is required, the statements of that paragraph are denied.

8.      Defendant is without sufficient knowledge or information to form a belief as to the truth of the allegations. To the extent a response is required, the statements of that paragraph are denied.

9.      Defendant is without sufficient knowledge or information to form a belief as to the truth of the allegations. To the extent a response is required, the statements of that paragraph are denied.

10.      Defendant is without sufficient knowledge or information to form a belief as to the truth of the allegations. To the extent a response is required, the statements of that paragraph are denied.

11.     Defendant is without sufficient knowledge or information to form a belief as to the truth of the allegations. To the extent a response is required, the statements of that paragraph are denied.

12.     Defendant is without sufficient knowledge or information to form a belief as to the truth of the allegations. To the extent a response is required, the statements of that paragraph are denied.

13.     Denied.

14.     Defendant is without sufficient knowledge or information to form a belief as to the truth of the allegations. To the extent a response is required, the statements of that paragraph are denied.

15.     The allegations of this paragraph are conclusions of law to which no response is required. To the extent a response is required, the statements of that paragraph are denied.

16.     Defendant is without sufficient knowledge or information to form a belief as to the truth of the allegations. To the extent a response is required, the statements of that paragraph are denied.

17.     Defendant is without sufficient knowledge or information to form a belief as to the truth of the allegations. To the extent a response is required, the statements of that paragraph are denied.

18.     Defendant admits that Plaintiff is using the name "Nubank" in the United States, but Defendant denies that Plaintiff has any lawful right to the use of the "Nubank" name.

19.     Denied.

## Hudson's [Alleged] Conduct

20.     For purposes of response to this paragraph, Defendant states that he and Nu Pagamentos have never had any contractual business relationship.

21.     Denied.

22.     Denied.

23.     Denied.

24.     The allegations as drafted are denied. Given his common law rights, Hudson has lawfully used the Nubank name in association with his advisory and banking services for many years. Hudson maintains the exclusive right to use the Nubank name in the United States. There is no "false[] claim" because Hudson retains exclusive rights to use the Nubank name in the United States.

25.     The allegations as drafted are denied. Given his common law rights, Hudson has lawfully used the Nubank name in association with his advisory and banking services for many years.

26.     The allegations as drafted are denied. Given his common law rights, Hudson has lawfully used the Nubank name in association with his advisory and banking services for many years.

27.     The allegations as drafted are denied. Given his common law rights, Hudson has lawfully used the Nubank name in association with his advisory and banking services for many years.

28.     The allegations as drafted are denied.

29.     Denied that Hudson "has engaged in a campaign to harass and threaten Nubank's executives' lives and safety."

30.     Admitted that Hudson registered the domain name Nubank.com in 1997. Further admitted that Hudson has regularly renewed and maintained the domain name since 1997.

31.     The allegations as drafted are denied. Given his common law rights, Hudson has lawfully used the Nubank.com domain name in association with his advisory and banking services for many years.

32.     The allegations as drafted are denied. Given his common law rights, Hudson has lawfully used the Nubank.com domain name in association with his advisory and banking services for many years.

33.     The allegations as drafted are denied. Given his common law rights, Hudson has lawfully used the Nubank.com domain name in association with his advisory and banking services for many years.

34.     Denied.

35.     Denied. Given his common law rights, Hudson has lawfully used the Nubank.com domain name in association with his advisory and banking services for many years.

**Count I - Trademark Infringement 15 U.S.C. §1114(1)**

36.     The allegations of this paragraph are conclusions of law to which no response is required. To the extent a response is required, the statements of that paragraph are denied.

37.     Denied.

38.     Denied.

39.     Denied.

40.     Denied.

41.     Denied.

42.     Denied.

**Count II - Unfair Competition and False Designation of Origin 15 U.S.C. §1125(a)**

43.     The allegations of this paragraph are conclusions of law to which no response is required. To the extent a response is required, the statements of that paragraph are denied.

44.     Denied.

45.     Denied.

46.     Denied.

47.     Denied.

48.     Denied.

**Count III - False Advertising 15 U.S.C. §1125(a)(1)(B)**

49.     The allegations of this paragraph are conclusions of law to which no response is required. To the extent a response is required, the statements of that paragraph are denied.

50.     The allegations as drafted are denied. Given his common law rights, Hudson has lawfully used the Nubank name in association with his advisory and banking services for many years.

51.     Denied.

52.     Denied.

53.     Denied.

**Count IV - Anticybersquatting Consumer Protection Act 15 U.S.C. §1125(d)**

54.     The allegations of this paragraph are conclusions of law to which no response is required. To the extent a response is required, the statements of that paragraph are denied.

55.     Defendant is without sufficient knowledge or information to form a belief as to the truth of the allegations. To the extent a response is required, the statements of that paragraph are denied.

56.     Denied.

57.     Denied.

58.     Denied.

59.     Denied.

60.     Denied.

61.     Denied.

**Count V - Declaratory Judgment - 28 U.S.C. §2201**

62.     The allegations of this paragraph are conclusions of law to which no response is required. To the extent a response is required, the statements of that paragraph are denied.

63.     Hudson admits there is controversy regarding the Nubank name.

64.     The allegations of this paragraph are conclusions of law to which no response is required.

65.     The allegations of this paragraph are conclusions of law to which no response is required.

66.     Denied.

67.     The allegations of this paragraph are conclusions of law to which no response is required. To the extent a response is required, Hudson denies that Plaintiff is entitled to any relief.

## AFFIRMATIVE DEFENSES

Defendants further defend based on the following affirmative defenses:

### Laches

1.      Plaintiff's unreasonable delay in assertion of its purported rights against Defendant had the effect of material prejudice to Defendant as a result of Plaintiff's delay. During the applicable period, Defendant continued to invest resources in his business. Defendant's business continued to grow and operate successfully as a result of Defendant's continued and ongoing use of the trademark.

### Unclean Hands

2.      Plaintiff has acted in bad faith toward Defendant as to the matters contained in the Complaint. Plaintiffs' prior bad faith actions preclude relief against Defendant.

### Waiver

3.      If Plaintiff ever had any legal right to preclude Defendant's use of the purported trademarks, Plaintiff freely and knowingly gave up its rights by waiving any rights it previously held. Defendant relied upon Plaintiffs' waiver of any rights, and such waiver cannot now be reneged given Defendant's detrimental reliance on Plaintiff's waiver of rights.

### Failure to Mitigate Damages

4.      Plaintiff has not taken reasonable action to minimize any harm or costs it claims were caused by Defendant. Based on the lack of reasonable action on the part of Plaintiff, Defendant is now being blamed for harms that were not the result of his actions.

### No Actual Injury or Damages

5.      Even if Plaintiff demonstrates liability under any of its claims, Plaintiff cannot demonstrate any actual damages.

8

**Lack of Causation**

6.      Defendant was not the proximate or legal cause of Plaintiff's alleged injuries.

**Abandonment**

7.      Plaintiff abandoned their trademark by failing to properly police their purported trademarks and trade dress in the marketplace. Any purported rights Plaintiffs may have had in any mark in the United States were abandoned, pursuant to 15 U.S.C. §1127.

**Implied License**

8.      Plaintiffs' failure to police its trade dress, acquiescence to Defendant's use, and failure to act led to an implied license in Defendants' use of the trademarks. Defendants detrimentally relied upon the implied license in creating, developing, and maintaining its business.

**Acquiescence**

9.      Plaintiff, as well as agents acting under its control, through its own actions and its failure to raise objections to Defendants' actions, acquiesced to, encouraged, or furthered Defendant's actions prior to this lawsuit, but now states an objection to Defendant's use.

**Equitable Estoppel**

10.     Plaintiff's misleading conduct or inaction reasonably led to Defendants' reliance, which resulted in material prejudice to Defendants.

**Express Consent**

11.     Plaintiff, as well as agents acting under its control, expressly assented to, encouraged, or furthered Defendants' actions prior to this lawsuit, but now states an objection to Defendants' actions.

**Implied Consent**

12.     Plaintiff, as well as agents acting under its control, by clear implication, assented to, encouraged, or furthered Defendant's actions prior to this lawsuit, but now states an objection to Defendant's actions.

**Res Judicata**

13.     Plaintiff's claims are barred by the common law doctrine of res judicata or O.C.G.A. § 9-12-40, as may be applicable. Plaintiff previously pursued claims virtually identical to those in this suit, and such claims were resolved against Plaintiff.

**Collateral Estoppel**

14.     Plaintiff's claims are barred by the doctrine of collateral estoppel. Plaintiff previously pursued claims virtually identical to those in this suit, and such claims were resolved against Plaintiff.

**DEFENDANT'S COUNTERCLAIMS AGAINST NU PAGAMENTOS AND DOES 1-10**

Hudson hereby asserts counterclaims against Nu Pagamentos and Does 1-10 and states as follows:

**The Parties**

1.      Defendant/Counter-Plaintiff Dan Hudson is an individual residing in Georgia.

2.      Plaintiff/Counter-Defendant Nu Pagamentos is a corporation based in Brazil with a principal place of business at Rua Capote Valente 39, São Paulo, Brazil 05409-000. *See* Doc. #1 at ¶ 4.

3.      Third-party Defendant Does 1-10 are individuals that are not currently known to Hudson but are expected to be named in due course.

**Jurisdiction and Venue**

4.      Jurisdiction over the subject matter in this action in this Court is pursuant to 28 U.S.C. § 1367(a) because Defendant's claims against Plaintiff and against Third-Party Counter-Defendants form part of the same case or controversy under Article III of the United States Constitution as Plaintiff's claims under the Court's original jurisdiction.

5.      This Court has personal jurisdiction over Plaintiff because Plaintiff consented to jurisdiction in this Court based on its filing of this lawsuit in this Court.

6.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and (c) and 28 U.S.C. § 1400 because a substantial part of the events giving rise to these claims occurred within this District.

**Factual Background**

7.      Defendant/Counter-Claimant Hudson has been in the banking business for more than forty (40) years.

8.      In the late 1970s, Hudson was driving on Highway 101 in California, thinking about his banking and consulting business.

9.      While sitting in traffic, Hudson surmised that a good name for his banking and consulting services would be short enough to fit on a license plate, and no more than seven letters long.

10.     Hudson was professionally concentrating on the formation of new banks, sometimes known as *de novo* banks, and liked the idea of combining the brandable "nu" with the word "bank." The name "Nubank" was born.

11.     The name Nubank is a "fanciful" trademark, a completely new word, and accordingly entitled to the strongest possible trademark protection under United States law.

12.     Shortly after coming up with the business name, Hudson began using the Nubank name in conjunction with his banking services.

13.     Hudson also secured "Nubank" as a California vanity license plate for his vehicle, consistent with his original vision.

14.     Beginning in 1978, at the Bay Bank of Commerce in San Leandor, California, Hudson was providing his consulting services and began using the Nubank name in commerce for the first time.

15.     This event was the beginning of Hudson's continued, long-term use of the Nubank brand, that continues, unabated, to the date of this filing in May of 2021.

16.     Hudson has personally played a role in opening or consulting on at least one hundred and forty-six (146) small and community banks since 1979.

17.     In the course of Hudson's banking and consulting business, he is routinely engaged in marketing himself and the Nubank name.

18.     Among other things, Hudson routinely and consistently communicates with prospective clients, current clients, professional contacts, and more, all while employing the Nubank name.

19.     To this day, he continues to offer his banking and consulting services across the United States.

**Hudson's Ongoing Use of "Nubank" in United States Interstate Commerce**

20.     Since 1978, Hudson has continuously used the word "Nubank" in conjunction with banking and consulting services across the United States.

21.     During this time, he continually used the Nubank brand in numerous marketing materials, business cards, and more. One example of his business card is attached. *See* Exhibit #1.

22.     Hudson and Nubank are well known for the banking and consulting services offered.

23.     Hudson is well known among his clients, prospects, banking industry professionals and throughout the banking industry, generally.

24.     Moreover, Mr. Hudson has routinely been quoted or referenced in major newspapers and other publications. Most of these publications had a national presence across the United States during all times of question. Many had an international readership.

25.     In October of 2003, in American Banker, in an article entitled, "Can Start-Up Banks Become an Investment Niche?" the author quoted "Dan Hudson, the chief executive officer of NuBank." *See* Exhibit #3 at 1.

26.     In March of 2003, in Barron's, in an article entitled "Vaulting Ambition," the author noted that "Hudson . . . currently has more than 400 leads from would-be investors who have visited his Website, www.NuBank.com." *See* Exhibit #3 at 3.

27.     In June of 2004, in American Banker, in an article entitled, "Aspiring Hispanic Start-Ups Boast an Edge" the author referenced "Dan Hudson, the chief executive officer of Nubank." *See* Exhibit #3 at 8.

28.     In October of 2005, in Kiplinger's Personal Finance, in an article entitled, "7 Ways to Retire Rich Invest Creatively" the author quoted "Dan Hudson, president and chief executive officer of NuBank." *See* Exhibit #3 at 9.

29.     On December 4, 2007, in the "Abled" blog, entitled "Uncourageous #1: "New Approach to Banking for Physically Disabled," the author quoted "Nubank President Dan Hudson." *See* Exhibit #3 at 13.

30.     In Bank Advisor's November 2007 article entitled, "Gold Rush", the author quoted "Dan Hudson, CEO of Nubank." *See* Exhibit #3 at 14.

31.     In January of 2007, in Charlotte Business Journal, in an article entitled, "Startup Banks Face Tough Fund-Raising Environment" the author quoted Dan Hudson as a "consultant to banks." *See* Exhibit #3 at 16.

32.     In December of 2007, in Hispanic Trending, in an article entitled, "New Latino Owned Sta. Ana Bank in One of Just a few Nationwide" the author quoted "Dan Hudson of Nubank" *See* Exhibit #3 at 18.

33.     In December of 2007, in the Los Angeles Times, in an article entitled, "Santa Ana Bank Targets Locals" the author quoted "Dan Hudson of Nubank." *See* Exhibit #3 at 20.

14

34.     In May of 2007, in St. Petersburg Times, in an article entitled, "More New Banks Meeting Local Needs" the author quoted "Dan Hudson, president of the NuBank Group." *See* Exhibit #3 at 26.

35.     In January 2009, in Smart Money, in an article entitled "Your Own Private ATM," the author noted "Hudson, who heads NuBank." *See* Exhibit #3 at 27.

36.     In September of 2009, in Wealth Management, in an article entitled "You Can Open a Bank" the author notes his source as "Dan Hudson, founder and CEO of Nubank" and quotes Mr. Hudson numerous times. *See* Exhibit #3 at 37.

37.     In June of 2014, in the "M-RCBG Associate Working Paper Series" published by Mossavar-Rahmani Center for Business & Government of Harvard University, an article entitled "Incubating Inner-City Branches for Acquisition by Financial Institutions" takes note of "Nubank CEO, Dan Hudson" and quotes him for his expertise. *See* Exhibit #3 at 40.

38.     In 2016, in A State of the Region White Paper, in a study entitled "State of the Cascades West Economic Development District: The Banking Industry," the authors quoted "Dan Hudson, founder and CEO of Nubank." *See* Exhibit #3 at 42.

39.     In March 2020, in American Banker, in an article entitled, "De Novo Activity Has Gone Silent. What Happened?" the author quotes "Dan Hudson, CEO of NuBank." *See* Exhibit #3 at 44.

40.     In April of 2020, in American Banker, in an article entitled "After surge, bank startups take snooze," the author quoted "Dan Hudson, the chief executive of NuBank." *See* Exhibit #3 at 50.

41.     In January 2020, in Banking Dive, in an article entitled "De Novo Activity Fell in 2019 Despite FDIC Flea", the author quoted "Dan Hudson, CEO of NuBank." *See* Exhibit #3 at 53.

42.     In January 2020, in Banking Dive, in an article entitled "De Novo Activity Fell in 2019 Despite FDIC Flea", the author quoted "Dan Hudson, CEO of NuBank." *See* Exhibit #3 at 53.

43.     These articles in prominent national and industry media demonstrate that Hudson has been commonly known as "Nubank" in his banking and consulting business.

44.     On information and belief, there are other instances of Mr. Hudson being quoted or featured prominently in notable press and other media outlets that may become further known during discovery.

**Hudson's Ownership of the Nubank.com Domain Name**

45.     Hudson registered the domain name nubank.com for the first time on April 23, 1997. Hudson was personally listed as the registered owner when he registered the domain. *See* Exhibit #2.

46.     Hudson has continuously owned the nubank.com domain name for more than twenty-four (24) years and he continues to maintain ownership of the domain name.

47.     The Nubank.com website has been consistently active in interstate commerce on the internet since 1997, advertising Hudson's banking and consulting services.

48.     While certain historical records are not currently available from over twenty years ago, there are abundant public archives of the content of the nubank.com website available online since around the turn of the century.

49.     From 1997 to 1999, Hudson's Nubank.com website was continuously available in interstate commerce on the internet. The content on the Nubank.com website advertised Hudson's nationwide banking and consulting services.

50.     In 2000, Hudson's Nubank.com website was continuously available in interstate commerce on the internet. Evidence of the website advertising Hudson's banking services was available on October 19, 2000. *See* Exhibit #4, Year 2000 Screenshots. The website was regularly available throughout 2000, and not merely on the date noted.

51.     In 2001, Hudson's Nubank.com website was continuously available in interstate commerce on the internet. Among other dates, evidence of the website advertising Hudson's banking services was available in 2001 on January 22, February 5, March 1, April 18, May 16, June 16, July 21 and December 2, 2001. *See* Exhibit #5, Year 2001 Screenshots. The website was regularly available in 2001, and not merely on the dates noted.

52.     In 2002, Hudson's Nubank.com website was continuously available in interstate commerce on the internet. Among other dates, evidence of the website advertising Hudson's banking services was available in 2002 on March 30, May 30, June 5, August 2, September 29 and November 29, 2002. *See* Exhibit #6, Year 2002 Screenshots. The website was regularly available in 2002, and not merely on the dates noted.

53.     In 2003, Hudson's Nubank.com website was continuously available in interstate commerce on the internet. Among other dates, evidence of the website advertising Hudson's banking services was available in 2003 on January 30, February 13, March 21, April 26, May 30, June 21, July 23, August 5, September 26, October 17, November 24 and December 6, 2003. *See* Exhibit #7, Year 2003 Screenshots. The website was regularly available in 2003, and not merely on the dates noted.

54.     In 2004, Hudson's Nubank.com website was continuously available in interstate commerce on the internet. Among other dates, evidence of the website advertising Hudson's banking services was available in 2004 on January 30, March 28, May 20, June 28, August 29, September 25, and December 13, 2004. *See* Exhibit #8, Year 2004 Screenshots. The website was regularly available in 2004, and not merely on the dates noted.

55.     In 2005, Hudson Nubank.com website was continuously available in interstate commerce on the internet. Among other dates, evidence of the website advertising Hudson's banking services was available in 2005 on February 10, August 25, November 24 and December 31, 2005. See Exhibit #9, Year 2005 Screenshots. The website was regularly available in 2005, and not merely on the dates noted.

56.     In 2006, Hudson's Nubank.com website was continuously available in interstate commerce on the internet. Among other dates, evidence of the website advertising Hudson's banking services was available in 2006 on February 5, March 29, April 14, June 15, July 14, August 24, October 23, November 23, and December 31, 2006. *See* Exhibit #10, Year 2006 Screenshots. The website was regularly available in 2006, and not merely on the dates noted.

57.     In 2007, Hudson's Nubank.com website was continuously available in interstate commerce on the internet. Among other dates, evidence of the website advertising Hudson's banking services, was available in 2007 on January 28, February 24, April 10, June 10, July 10, August 28, September 11 and October 22, 2007. *See* Exhibit #11, 2007 Screenshots. The website was regularly available in 2007, and not merely on the dates noted.

58.     In 2008, Hudson Nubank.com website was continuously available in interstate commerce on the internet. Among other dates, evidence of the website advertising Hudson's banking services was available in 2008 on April 24 and July 22, 2008. *See* Exhibit #12, Year

2008 Screenshots. The website was regularly available in 2008, and not merely on the dates noted.

59.     In 2009, Hudson's Nubank.com website was continuously available in interstate commerce on the internet. Among other dates, evidence of the website advertising Hudson's banking services was available in 2009 on February 19, 2009. *See* Exhibit #13, Year 2009 Screenshots.

60.     In 2010, Hudson's Nubank.com website was continuously available in interstate commerce on the internet. Among other dates, evidence of the website advertising Hudson's banking services was available in 2010 on February 1, July 22, August 25 and November 21, 2010. *See* Exhibit #14, Year 2010 Screenshots. The website was regularly available in 2010, and not merely on the dates noted.

61.     In 2011, Hudson's Nubank.com website was continuously available in interstate commerce on the internet. Among other dates, evidence of the website advertising Hudson's banking services was available in 2011 on January 28, March 11, September 2, October 20, November 1, and December 2, 2011. *See* Exhibit #15, Year 2011 Screenshots. The website was regularly available in 2011, and not merely on the dates noted.

62.     In 2012, Hudson's Nubank.com website was continuously available in interstate commerce on the internet. Among other dates, evidence of the website advertising Hudson's banking services was available in 2012 on January 2, March 14, April 12, May 2, August 15, October 29 and November 13, 2012. *See* Exhibit #16, Year 2012 Screenshots. The website was regularly available in 2012, and not merely on the dates noted.

63.     In 2013, Hudson's Nubank.com website was continuously available in interstate commerce on the internet. Among other dates, evidence of the website advertising Hudson's

banking services was available in 2013 on March 31, May 9, June 14, August 26 and November 26, 2013. *See* Exhibit #17, Year 2013 Screenshots. The website was regularly available in 2013, and not merely on the dates noted.

64.     In 2014, Hudson's Nubank.com website was continuously available in interstate commerce on the internet. Among other dates, evidence of the website advertising Hudson's banking services was available in 2014 on January 4, March 27, July 1, and December 14, 2014. *See* Exhibit #18, Year 2014 Screenshots. The website was regularly available in 2014, and not merely on the dates noted.

65.     In 2015, Hudson's Nubank.com website was continuously available in interstate commerce on the internet. Among other dates, evidence of the website advertising Hudson's banking services was available in 2015 on January 8, February 18, March 22, May 29, July 29, August 1, September 9, and December 18, 2015. *See* Exhibit #19, Year 2015 Screenshots. The website was regularly available in 2015, and not merely on the dates noted.

66.     In 2016, Hudson's Nubank.com website was continuously available in interstate commerce on the internet. Among other dates, evidence of the website advertising Hudson's banking services was available in 2016 on January 11, February 12, March 18, April 10, May 28, October 9, and November 24, 2016. *See* Exhibit #20, Year 2016 Screenshots. The website was regularly available in 2016, and not merely on the dates noted.

67.     In 2017, Hudson's Nubank.com website was continuously available in interstate commerce on the internet. Among other dates, evidence of the website advertising Hudson's banking services was available in 2017 on June 10, July 5, October 17 and November 22, 2017. *See* Exhibit #21, Year 2017 Screenshots. The website was regularly available in 2017, and not merely on the dates noted.

68.     In 2018, Hudson's Nubank.com website was continuously available in interstate commerce on the internet. Among other dates, evidence of the website advertising Hudson's banking services was available in 2018 on May 7 and September 7 and October 23, 2018. See Exhibit #22, Year 2018 Screenshots. The website was regularly available in 2018, and not merely on the dates noted.

69.     In 2019, Hudson Nubank.com website was continuously available in interstate commerce on the internet. Among other dates, evidence of the website advertising Hudson's banking services, was available as it appeared in 2019 on February 1, July 22, August 25 and November 21, 201May 25, 2019. *See* Exhibit #22, Year 2018 Screenshots. The website was regularly available in 2019, and not merely on the dates noted.

70.     In 2020, Hudson's Nubank.com website was continuously available in interstate commerce on the internet. Among other dates, evidence of the website advertising Hudson's banking services was available as it appeared in 2020 on October 28, November 13 and December 5, 2020. *See* Exhibit #24, Year 2020 Screenshots. The website was regularly available in 2020, and not merely on the dates noted.

71.     In 2021, Hudson's Nubank.com website was continuously available in interstate commerce on the internet. Among other dates, evidence of the website advertising Hudson's banking services was available as it appeared in 2021 on January 21, February 25, and May 12 2021. *See* Exhibit #25, Year 2021 Screenshots. The website was regularly available in 2021, and not merely on the dates noted. The website continues to be available in interstate commerce.

72.     The registration and use in commerce of nubank.com is *prima facie* demonstration of Hudson's priority ownership and use of the Nubank trademark that clearly predates any of Plaintiff's purported uses or rights.

**Plaintiff's Knowledge of Hudson's Existing Trademark Rights**

73.     Plaintiff's CEO and Founder is David Vélez.

74.     Around 2009-2010, Vélez contacted Dan Hudson by phone and email while interning at Sequoia Capital in Menlo Park, California.

75.     At the time, Hudson had been well-known in the banking scene throughout the United States, as demonstrated above, but was particularly well known in the Bay Area of California, where Hudson was residing.

76.     Vélez contacted Hudson in 2009 because Vélez was interested in buying Hudson's Nubank.com website and trademark.

77.     Vélez knew that Hudson was the owner of the domain name and all underlying intellectual property rights because Hudson was known for using the Nubank brand.

78.     Moreover, the WHOIS record for the domain name nubank.com listed Hudson as the owner.

79.     At the time of Vélez's inquiry around 2009, Hudson declined to sell the Nubank trademark or domain name.

80.     In or around 2013, Velez moved to Brazil, armed with business investment from Sequoia Capital and Kaszek Ventures.

81.     Despite actual knowledge of Hudson's Nubank trademark rights in the United States, Vélez named his Brazil venture the confusingly similar "Nubank," and began to build the business.

82.     In the summer of 2014, David Velez and Dan Hudson had additional correspondence via the LinkedIn "InMail" messaging service. *See* Exhibit #26.

83.     On June 19, 2014, Hudson wrote a message to Velez: "David I am very familiar with and known at Sequoia Capital in Menlo Park. I am the owner of Nubank.com and other variations of this URL. It has been registered to me since 1995. I have of late had inquiries regarding nubank.com.br and other related iterations. You are listed as the registered owner of .org which should not be used in financial services or technology as it appears to be occurring in br. Please advise." *Id.*

84.     Hudson's message to Velez identified the actual confusion that was already occurring between Hudson's existing trademark and Velez's startup venture in Brazil. Hudson also made it clear that Nubank should "not be used in financial services" by Velez and his company. *Id.*

85.     On June 9, 2014, Velez replied, with the identifying email address of "david@nubank.com.br." Velez stated: "Hi Dan, Thank you for your message. We have invested in a new online bank in Brazil named NUbank. While NUbank's operations are restricted to Brazil (where the company has full trademark rights), we would be very interested in purchasing nubank.com from you. We notice the site is currently not being used (it receives very little traffic, most of the links in the site are broken, and the latest content dates back to 2009), and therefore wanted to discuss a proposal. On top of paying you for the site, we could also offer you a slightly different site if you choose to maintain your site live, such as gonubank.com, or nubanks.com (which we own), and we could even offer you some professional help building SEO capabilities into your site for free. Could I call you to discuss a proposal? Please let me know, Thank you very much, David." *Id.*

86.     In his message, Velez admitted that any rights Velez's business maintained were "restricted to Brazil," and that Hudson's nubank.com website was "live" and accessible on the

Internet, and that Hudson's site had been active in 2009, well before Plaintiff's business existed. *Id.*

87.     Hudson is of the current belief that he did not respond to Velez's June 9, 2014 message.

88.     Despite no response from Hudson, Velez unilaterally wrote another message to Hudson about a month later, on July 17, 2014, stating: "Hello Dan, Could we have a brief call whenever convenient? We would be able to offer your [sic] a meaningful amount to purchase your domain, and if you are interested in keeping it live we could help you transfer it to a slightly different domain, at no cost to you. We could even help in redesigning it by including some Search Engine Optimization. Just let me know when we [sic] is good for you to chat. Thank you very much, David." *Id.*

89.     In his message, Velez admitted that any acquisition would require an "offer" "of a meaningful amount" from Velez and his firm, and again admitted that Hudson's nubank.com was "live" on the internet. *Id.*

90.     Since 2014, on information and belief, Velez and Nu Pagamentos have made various other attempts to purchase the domain name and Hudson's associated United States trademark rights.

91.     These attempts have come in the form of third-party "domain name broker" inquiries that did not identify their association with Nu Pagamentos, in an attempt to hide the fact that Nu Pagamentos was the actual buyer of the domain name.

92.     Despite inquiries from various parties, including Nu Pagamentos, Hudson has never agreed to sell his domain name or his associated United States trademark rights in the Nubank brand.

**Plaintiff's Intentional Infringement of Hudson's Rights and Bad Faith towards Hudson**

93.     Despite the clear evidence of Hudson's ongoing use, and Plaintiff's knowledge of the same, Plaintiff has used, and continues to use, its considerable resources in an attempt to hijack Hudson's existing trademark rights in "Nubank" and Hudson's ownership in the nubank.com domain name.

94.     This instant lawsuit is the latest iteration of these attempts, but Plaintiff, and it's very capable attorneys, have engaged in previous efforts to underhandedly deprive Mr. Hudson of his ownership rights in the Nubank trademark and domain name.

95.     In December of 2019, Ms. Pam Jacobson, an accomplished attorney at K&L Gates, who advertises herself as "a leading practitioner in intellectual property law" filed a UDRP[2] proceeding against nubank.com on behalf of Nu Pagamentos S.A. *See* Exhibit #27, UDRP Complaint.

96.     The UDRP matter was assigned Case No. D2019-3138. Id.

97.     On information and belief, Nu Pagamentos actively hired Ms. Jacobson and K&L Gates to file the UDRP proceeding.

98.     On information and belief, Nu Pagamentos also authorized the content of the UDRP Complaint.

99.     Despite Velez, the founder of Nu Pagamentos, knowing of Hudson's rights, the UDRP Complaint made numerous inaccurate statements to the Arbitrator.

---

[2] The Uniform Domain-Name Dispute-Resolution Policy (UDRP) is a process established by the Internet Corporation for Assigned Names and Numbers (ICANN) for the resolution of disputes regarding the registration of internet domain names. It is a mandatory proceeding for registrants of certain top level domain names, including .com domains. Best described as a binding arbitration procedure UDRP proceedings are quite common when it comes to domain name disputes.

100.    First, Nu Pagamentos, through its counsel, falsely claimed that "Respondent has no legitimate rights in the domain name <nubank.com>" despite knowing that Hudson had owned and operated the domain name since 1997. *Id.* at 6.

101.    Next, Nu Pagamentos, through its counsel, falsely claimed that "Respondent is not commonly known as 'Nubank.'" *Id.*

102.    Next, Nu Pagamentos, through its counsel, falsely claimed that "Respondent registered and is using the domain name <nubank.com> in bad faith." *Id.*

103.    Next, Nu Pagamentos, through its counsel, admits the real reason for the filing of the UDRP, namely, its frustration that Hudson has refused to sell his rights in the trademark to Plaintiff for a price that Plaintiff wants to pay.

104.    Notably, counsel states that "Mr. Hudson has consistently refused to participate in good-faith negotiations regarding a purchase or transfer of the domain and has, instead, demanded unreasonably high sums from Complainant." *Id.*

105.    This statement, that Plaintiff has consistently sought to purchase the rights it knows that Hudson owns, serves as an admission that Hudson is the rightsholder of the Nubank name in the United States.

106.    Moreover, the Plaintiff's suggestion that Hudson demands "unreasonably high sums" for transfer of his valuable rights is further evidence of a bad faith UDRP proceeding because Plaintiff wrongly suggests that it is entitled to Hudson's intellectual property rights at a price that only Plaintiff considers reasonable. *Id.*

107.    On February 14, 2020, a decision on Plaintiff's UDRP Complaint was issued by independent panelist Steven A. Maier. *See* Exhibit #28. The decision is publicly available at: https://www.wipo.int/amc/en/domains/decisions/text/2019/d2019-3138.html

26

108.    Mr. Maier is an experienced intellectual property solicitor in London that has successfully and fairly adjudicated numerous domain name disputes in the past.

109.    Maier found that "Respondent [Hudson] registered the disputed domain name some 17 years prior to the Complainant's [Nu Pagamentos] first use of its trademarks in question." *Id.*

110.    Maier also found that "The Respondent cannot have been aware of the Complainant's trademark when he registered the disputed domain name as it did not exist at that date." *Id.*

111.    Of particular note, Maier, a disinterested arbitrator, found the existence of "Reverse Domain Name Hijacking," which is a non-monetary sanction under the domain name arbitration rules.

112.    First, Maier noted that, "Under paragraph 15(e) of the Rules: 'If after considering the submissions the Panel finds that the complaint was brought in bad faith, for example in an attempt at Reverse Domain Name Hijacking or was brought primarily to harass the domain-name holder, the Panel shall declare in its decision that the complaint was brought in bad faith and constitutes an abuse of the administrative proceeding.'" *Id.*

113.    Maier went on to note that "The Complainant is professionally represented in this matter and, in the opinion of the Panel, knew or ought to have known that it had no reasonable chance of prevailing in this proceeding for the reasons set out above, including in particular the fact that the disputed domain name had been registered many years before the Complainant began using the trademarks in question." *Id.*

114.    Next, Maier wrote that "Further, the Complainant's admission that it has tried but failed to purchase the disputed domain name from the Respondent suggests to the Panel that this

proceeding represents a fallback, in circumstances where the Complainant has failed to secure the disputed domain name by commercial negotiation." *Id.*

115.    Maier finally concluded that "the Complaint was brought in bad faith and constitutes an abuse of the administrative proceeding." *Id.*

116.    The UDRP decision, issued in February of 2020, gave indisputable notice to Plaintiff that its litigation strategy was "bad faith" and "an abuse" of the UDRP process.

117.    Despite already being sanctioned and found to be acting in bad faith by an independent arbitrator, Plaintiff now brings this instant lawsuit, with allegations virtually identical to those that appeared in the failed UDRP complaint.

118.    Most tellingly, the Complaint in the instant matter again contains an admission virtually identical to the admission in the UDRP complaint, namely that Plaintiff is upset that Hudson has demanded "several hundred thousand dollars from Nubank to purchase the domain name from him." *See* Doc. #1 at ¶ 35.

119.    Hudson, who has owned the Nubank name for more than forty (40) years and the nubank.com domain name for more than twenty-four (24) years has absolutely no obligation to sell his trademark rights or domain name to any party, Plaintiff or otherwise.

120.    Plaintiff is on notice that Hudson considers this lawsuit to have been filed in bad faith, particularly in light of the Plaintiff's prior failed UDRP efforts.

**Plaintiff's Infringing Use of Hudson's Nubank Trademark**

121.    Plaintiff admits in its Complaint that it is now using the Nubank mark in commerce in the United States.

122.    Plaintiff specifically states that "Overall, [Nu Pagamentos] has continually used its trademark in connection with its goods and services that have been advertised and promoted around the world, including the United States." *See* Doc. #1 at ¶ 18.

123.    Plaintiff also admits that, "in the United States, there is extensive usage of Nubank-issued credit cards by customers, Nubank's marks and products have been advertised on the Nasdaq billboard in New York City, and many of Nubank's investors are based in the United States." *Id.*

124.    On information and belief, Plaintiff is using the Nubank mark on, among other things, software applications targeted to United States consumers, websites and other digital media targeted to United States users, and more. *See* Exhibit #29, Plaintiff Trademark Filing.

125.    Plaintiff, in support of its recently issued trademark, did not represent that there was any use of the Nubank name in the United States until "01/00/2018."

126.    Despite claiming use in commerce in early 2018, Plaintiff curiously made no efforts to amend its trademark application until almost three years after its purported first use.

127.    On information and belief, the Plaintiff's "date of first use" reported to the United States Patent and Trademark office is fraudulent, and the Plaintiff's actual date of first use in the United States is sometime in 2020, which is the date of the specimen submitted to the United States Patent and Trademark Office.

128.    No matter the Plaintiff's date of first use in the United States, Defendant Hudson has years of priority use over any of Plaintiff's use of the Nubank mark in the United States.

129.    The Plaintiff's newly issued trademark is accordingly subject to cancellation.

130.    Defendant is not yet aware of the full extent of Plaintiff's infringing use in the United States and will make efforts to uncover such infringing use in discovery.

## Count I - False Designation of Origin and False Advertising
## Against Nu Pagamentos and Does 1-10

131.    Hudson repeats and reasserts each and every statement contained in all preceding Paragraphs as if set forth herein.

132.    Nu Pagamentos and Does are liable to Hudson for false designation of origin and false advertising subject to 15 U.S.C. § 1125(a).

133.    Hudson has common law trademark rights in the Nubank mark.

134.    Hudson has priority of use over Nu Pagamentos in the Nubank mark.

135.    Nu Pagamentos' promotion, advertising, distribution, sale, and/or offering for sale of goods in commerce using Hudson's Nubank mark is intended to, and is likely to, cause confusion or mistake or to deceive consumers and the public as to the origin, sponsorship, source, or affiliation of the goods.

136.    Consequently, these actions are intended and are likely to cause consumers and the public to incorrectly believe that Nu Pagamentos' products have been created, authorized, sponsored, approved, endorsed, or licensed by Hudson.

137.    Upon information and belief, these actions and false statements are likely to and have already confused and deceived consumers and the public regarding origin of Defendants' goods.

138.    There is actual confusion in the marketplace between Hudson's Nubank mark and Plaintiff's infringing use of the same name.

139.    Upon information and belief, Nu Pagamentos intends to continue its infringing acts, unless restrained by this Court.

140.     Upon information and belief, Nu Pagamentos has made and will continue to make profits and gains based on falsely associating themselves with Defendant's goodwill and reputation.

141.     Nu Pagamentos' actions have damaged and will continue to damage Hudson.

## COUNT II - Georgia Trademark Infringement
## Against Nu Pagamentos and Does 1-10

142.     Hudson repeats and reasserts each and every statement contained in all preceding Paragraphs as if set forth herein.

143.     Nu Pagamentos is liable to Hudson for infringement of Hudson's Nubank marks under Georgia law.

144.     Nu Pagamentos and Does 1-10 have used the Nubank trademark in interstate commerce on the same classes of goods on which Plaintiff uses the marks and in the same channels of trade as those in which Hudson sells his services, without the knowledge of or authorization by Hudson.

145.     Nu Pagamentos and Does 1-10 have acted with knowledge of Hudson's ownership of the marks and with the intent to unfairly benefit from the goodwill associated with Hudson's marks.

146.     Use of the mark by Nu Pagamentos and Does 1-10 is intended to and have caused confusion, mistake, and deception among consumers and the public as to origin, affiliation, or sponsorship of the Nubank name.

147.     There is actual confusion in the marketplace between Hudson's Nubank mark and Plaintiff's infringing use of the same name.

148.     Defendants' conduct thus constitutes trademark infringement under O.C.G.A. § 10-1-450 et seq.

149.    Nu Pagamentos' actions have damaged and will continue to damage Hudson.

### Count III – Georgia Statutory Unfair and Deceptive Trade Practices

150.    Hudson repeats and reasserts each and every statement contained in all preceding Paragraphs as if set forth herein.

151.    Defendants have engaged in unlawful, unfair, and fraudulent business acts, and deceptive, untrue, and misleading advertising.

152.    The conduct of Nu Pagamentos and Does 1-10 constitute deceptive trade practices under the Georgia Uniform Deceptive Trade Practices Act, O.C.G.A. § 10-1-370 et. seq.

153.    Nu Pagamentos' actions have damaged and will continue to damage Hudson.

### Count IV – Georgia Statutory Unfair Competition

154.    Hudson repeats and reasserts each and every statement contained in all preceding Paragraphs as if set forth herein.

155.    The conduct of Nu Pagamentos and Does 1-10 is causing and is likely to continue causing confusion, deception, and mistake by creating the false and misleading impression that Nu Pagamentos is operated by, affiliated, connected, or associated with Hudson.

156.    Defendants' acts constitute unfair competition in violation of O.C.G.A. § 23-2-55.

157.    Nu Pagamentos' actions have damaged and will continue to damage Hudson.

### Count V - Georgia Common Law Trademark Infringement

158.    Hudson repeats and reasserts each and every statement contained in all preceding Paragraphs as if set forth herein.

159.    The conduct of Nu Pagamentos and Does 1-10 constitutes common law trademark infringement under Georgia common law.

160.    Nu Pagamentos' actions have damaged and will continue to damage Hudson.

**Count VI - Georgia Common Law Unfair Competition**

161.    Hudson repeats and reasserts each and every statement contained in all preceding Paragraphs as if set forth herein.

162.    The conduct of Nu Pagamentos and Does 1-10 constitutes common law unfair competition under Georgia common law.

163.    Nu Pagamentos' actions have damaged and will continue to damage Hudson.

**Count VII - Cancelation of U.S. Reg. No. 6,297,728**

164.    Hudson repeats and reasserts each and every statement contained in all preceding Paragraphs as if set forth herein.

165.    Hudson seeks a cancellation of the Plaintiff's mark Nubank shown in Registration No. 6,297,728 based on Hudson's priority of use of the Nubank name in interstate commerce.

166.    While Hudson primarily relies upon his priority of use in seeking this cancellation, Hudson reserves all rights to cancel the registration based on any applicable law allowing for cancellation claims, including, but not limited to, any provision of 15 U.S.C. § 1052, 15 U.S. Code § 1064, or similar.

167.    As demonstrated, Hudson had use of the Nubank name that predated Nu Pagamentos' use by many years.

168.    Accordingly, Nu Pagamentos' Reg. No. 6,297,728 must be cancelled.

**Count VIII - Declaratory Judgment / Injunctive Relief - 28 U.S.C. § 2201**

169.    Hudson repeats and reasserts each and every statement contained in all preceding Paragraphs as if set forth herein.

170.    Hudson requests, pursuant to 28 U.S.C. § 2201, a declaration of the rights of the parties.

171.    First, Hudson seeks a declaration that Hudson is the true owner of all trademark rights in the Nubank trademark in the United States.

172.    Second, Hudson seeks a declaration that Plaintiff has no rights to the domain name nubank.com, which is, and always has been, owned, operated and controlled by Hudson.

## PRAYER FOR RELIEF

WHEREFORE, Defendant respectfully requests:

1.      Injunctive relief, as sought herein, precluding Nu Pagamentos and Does 1-10 from future infringement of Hudson's trademark, domain name, and other intellectual property;

2.      Declaratory relief, stating that Hudson is the owner of the Nubank mark in the United States and that Plaintiff has no rights in the nubank.com domain name.

3.      Nu Pagamentos and Does 1-10 be compelled to account for and disgorge to Hudson any and all profits derived by from the infringing acts described herein;

4.      An award for damages, in an amount to be proven at trial that is substantially in excess of $75,001, which may or may not include an election of any and all statutory damages, treble damages, punitive damages or other damages that may be available to Defendant under any statute or cause of action; including, but not limited to O.C.G.A. § 10-1-450 or O.C.G.A. § 51-12-5.1.

5.      An award of attorney's fees to Defendant, pursuant to any applicable statute allowing or requiring such fees, or pursuant to common law; including, but not limited to 15 U.S.C. § 1117(a) and the other statutes cited herein.

6.      An award to Defendant of reasonable litigation expenses;

7.      An award to Defendants of pre-judgment and post-judgment interest, to the extent allowable; and

8.      Such further relief as this Court may deem just and proper.

## JURY DEMAND

Defendant respectfully demands a trial by jury.

* * *

Respectfully submitted,

/s/ Eric Menhart
Eric Menhart, Esq.*
Lexero Law
512 C St NE
Washington, DC 20002
Phone: 855-453-9376
Fax: 855-453-9376
* *Admitted Pro Hac Vice*

Steven Becker, Esq.
Becker Law, LLC
One West Court Square
Suite 750
Decatur, Georgia 30030
404.777.1657
sbecker@beckerlawllc.com

*Attorneys for Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing was filed via the Court's ECF system and all parties of record were served via that system.

/s/ Eric Menhart
Eric Menhart, Esq.