1  THE FOLLOWING IS THE P.D.F. OF AN OFFICIAL TRANSCRIPT.  OFFICIAL

2  TRANSCRIPTS MAY ONLY BE FILED IN CM/ECF BY THE OFFICIAL COURT

3  REPORTER AND WILL BE RESTRICTED IN CM/ECF FOR A PERIOD OF 90 DAYS.

4  YOU MAY CITE TO A PORTION OF THE ATTACHED TRANSCRIPT BY THE DOCKET

5  ENTRY NUMBER, REFERENCING PAGE AND LINE NUMBER, ONLY AFTER THE

6  COURT REPORTER HAS FILED THE OFFICIAL TRANSCRIPT.  HOWEVER, YOU

7  ARE PROHIBITED FROM ATTACHING A FULL OR PARTIAL TRANSCRIPT TO ANY

8  DOCUMENT FILED WITH THE COURT.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    IN THE UNITED STATES DISTRICT COURT
                    FOR THE NORTHERN DISTRICT OF GEORGIA
 2                             ATLANTA DIVISION

 3   NU PAGAMENTOS S.A. -             )
     INSTITUICAO DE PAGAMENTO,        )
 4                                    )
              Plaintiff,              )
 5                                    )          DOCKET NUMBER
          vs.                         )          2:21-cv-00069-RWS
 6                                    )
     GEORGE DANIEL HUDSON,            )          ATLANTA, GEORGIA
 7                                    )          March 2, 2022
              Defendant.             )
 8   _____)          10:02 a.m.

 9                           PRETRIAL CONFERENCE

10                       TRANSCRIPT OF PROCEEDINGS
                  BEFORE THE HONORABLE RICHARD W. STORY
11                     UNITED STATES DISTRICT JUDGE

12

13

14

15   APPEARANCES:

16   FOR THE PLAINTIFF:        LUCAS W. ANDREWS, ESQ.
                               MATTHEW T. MCLAUGHLIN, ESQ.
17

18
     FOR THE DEFENDANT:        ERIC MENHART, ESQ.
19

20            MECHANICAL STENOGRAPHY OF PROCEEDINGS
21         AND COMPUTER-AIDED TRANSCRIPT PRODUCED BY

22
     OFFICIAL COURT REPORTER:       DENISE M. STEWART, RPR
23                                  2314 UNITED STATES COURTHOUSE
                                    75 TED TURNER DRIVE, SOUTHWEST
24                                  ATLANTA, GEORGIA 30303
                                    (404)215-1516
25
```

1          *(IN ATLANTA, FULTON COUNTY, GEORGIA, MARCH 2, 2022, IN OPEN*
2     *COURT.)*

3          THE COURT SECURITY OFFICER:  All rise.  The Honorable
4     United States District Court for the Northern District of Georgia,
5     the Gainesville division is now in session.  The Honorable Judge
6     Richard W. Story presiding.

7          THE COURT:  Be seated.

8          THE COURTROOM DEPUTY:  The Court now calls for pretrial
9     conference Civil Action 2:21-cv-69.  Nu Pagamentos S.A. vs. George
10    Hudson.

11         Counsel, please state your name for the record.

12         MR. ANDREWS:  Good morning.  Luke Andrews, Poole
13    Huffman, for the plaintiff.  And with me is Matt McLauglin of
14    Nixon Peabody in Boston.

15         MR. MCLAUGHLIN:  Good morning, Your Honor.

16         MR. MENHART:  Good morning, Your Honor.

17         Eric Menhart on behalf of the defendant, George Hudson.

18         THE COURT:  Good morning.

19         MR. MENHART:  Good morning.

20         THE COURT:  Thank you all for being here this morning.

21         We are here, of course, to address some issues on the
22    discovery that have arisen.  We will proceed somewhat informally.
23    It's my preference that we just dive into the points that are at
24    issue and have discussions about those as opposed to doing
25    presentations and so forth.  I have read everything that you have

1   submitted to me.

2        And in terms of your briefs, I haven't read every
3   request admitted or so forth.  But I've read -- I think I'm
4   familiar with what your positions are and have some questions that
5   I will want to ask you to help me zero in on a resolution of some
6   of these matters.

7        Our policy is that folks are required to wear masks
8   except when their speaking, you are permitted to remove your mask
9   but you are not required to.  If you're more comfortable wearing
10  your mask at all times, please know that you are welcome to do
11  that.

12       Because I want to engage you in some conversation about
13  these matters, you're welcomed to remain seated as we do that.
14  But if you are the speaking party, I would just ask if you'd make
15  sure you'd pull a microphone close to you so that I can hear you
16  and so the court reporter can hear you to take down your comments.

17       My intention this morning is not so much to dig way down
18  in the weeds down -- and work through every request or every
19  interrogatory but rather to work not at 20,000 but maybe 10,000
20  feet on this and try to get some broader structure to this and
21  give you some direction from my perspective in terms of what is
22  required and where we need to go to move this case along.

23       As I said, I've looked at the submissions that we have
24  and I think can move us into focus perhaps in trying to resolve
25  those.

1         The first motion I would like to address is the

2  plaintiff's motion to compel.  And because there's -- it seems to

3  me and let me say this up front, I may make comments about how the

4  evidence appears or how things appear.  Please know that I'm doing

5  that based on what I'm seeing and what's been submitted.  I'm not

6  making any rulings today.  So don't take anything I say to say

7  that I've won or I've lost.  It's what the way it is.  It's just

8  what I'm looking for in what's submitted.  And what I think each

9  of you is fairly looking for to get from the other to be able to

10 make your case.

11        In terms of the plaintiff's motion to compel, the thing

12 that that -- Mr. Menhart, that I've struggled with a bit here, and

13 I've looked at your responses to the motion and I've gone --

14 you've referenced some of the documents that you produced.  And

15 here's my struggle and I think it's theirs.  And I think this

16 struggle explains what I think was a bit of overkill on behalf of

17 the plaintiff that you complained about in their third request for

18 admissions.  But I think that's prompted by the responses you've

19 given in earlier ones.

20        I'm still looking for an invoice or something that shows

21 your client sold anything.  You struggle with what a good is.  I

22 think I know what goods are.  But call it goods, services --

23 what -- I have not found an invoice yet that shows under the

24 Nubank name anything was ever sold to anyone.

25        Are there such invoices out there?

1          MR. MENHART:   Thank you, Your Honor.

2          So just as you said, "10,000 point view."  Mr. Hudson is

3    probably best analogized to a senior judge on a district court.

4    He was very intensely active for quite sometime -- years.  Later

5    on he was less active.  That does not mean that he stopped doing

6    business.

7          So to answer your question, many of the documents that

8    he had were bluntly held by other parties.  And we had -- and we

9    put a lot of time and effort into this.  We went to third parties.

10   And sent subpoenaes for his former customers.  Hey, send us what

11   you have.  We did the very best that we could.

12         As far as invoices, very recently, but for purposes of

13   discovery, we submitted approximately 40,000 documents.  Many of

14   which included not only invoices but summaries of sales and a

15   variety of other things that the defendant and the

16   counterplaintiff undertook.

17         Recently, and this has come out in the depositions

18   similarly, Mr. Hudson has had a more limited scope of actually

19   selling his services for a fee.  We're not disputing that by any

20   stretch of the imagination.  But we are suggesting that Mr. Hudson

21   is actively in commerce.  He's actively trying to solicit

22   business.  He has done some small pieces of business with some

23   other folks.  He's out there trying to attract business.  He is an

24   expert in the field.

25         So the invoices are presented.  But most of the invoices

1  were from earlier or we had more trouble getting that information.
2  We received the information and we produced it.  And I know this
3  will probably come up a little bit later.  But this is also
4  information that the plaintiffs have independently obtained by a
5  third-party subpoena.  So at this point they now have two separate
6  copies of these invoices, plus they have the deposition testimony.
7  And there is, I believe, one invoice recently which has also been
8  produced.  And, again, that was the deposition -- was within the
9  deposition transcript.

10          THE COURT:  Are those the Conti documents that you're
11  talking about?

12          MR. MENHART:  I'm sorry?

13          THE COURT:  Are those the Conti documents that you're
14  talking about?

15          MR. MENHART:  Yes, sir.

16          THE COURT:  So aside from the Conti documents, are there
17  other invoices you have been able to discover or be able to be in
18  the position to produce?

19          MR. MENHART:  Yes, we have produced, I believe, one
20  invoice over the last couple of years that has been produced.
21  And, again, Your Honor, this is in addition to a wide variety of
22  other documents that demonstrate that Mr. Hudson has been using
23  the name in commerce.

24          THE COURT:  The one -- the one invoice other than the
25  Conti that you've produced, is it on a Nubank letterhead or is

1   it -- does it appear to be an invoice from Nubank?

2               MR. MENHART:  Yes.

3               THE COURT:  Do you recall what year that would have

4   been?

5               MR. MENHART:  Off the top of my head I believe it was

6   2018, 2019, 2020.  And, again, that's a range -- the approximate

7   range.

8               THE COURT:  Okay.  All right.  And that was for a

9   service that he provided?

10              MR. MENHART:  Yes.  Correct.  He was doing some

11  consulting work for a former client -- former and current client.

12  I believe it was in Utah, a western state -- Utah, New Mexico.

13  Again, I apologize.  I don't have the document in front of me

14  right now.

15              THE COURT:  Was the invoice paid?

16              MR. MENHART:  I believe he obtained a deposit.  Again,

17  this is very specific question but I believe he obtained a

18  deposit.

19              THE COURT:  Because when I looked through the documents,

20  I saw lots of e-mails and lots of communications and talk about

21  working in acquiring banks and doing all these things.  But I had

22  a hard time -- well, and I saw -- was it Nubank guru?

23              MR. MENHART:  That's correct.

24              THE COURT:  I mean, that's an e-mail address.

25              Are you contending that that's presenting as Nubank; is

1  that part of your case that that's evidence that that's how he was

2  operating as opposed to that just being -- I don't know.

3  Everything I can think of to use is probably not appropriate.  So

4  I'm not even going to try it.

5         So -- but is it your position that that's holding

6  himself out as Nubank?

7         MR. MENHART:  Yes, Your Honor.  Our position -- and,

8  again, we try to keep it high level here.  Our position -- and we

9  feel the law is relatively clear on this:  Is that Mr. Hudson

10  established rights to market in the United States 30 years ago,

11  40 years ago, and he continued to use the market consistently

12  overtime.

13        Now in addition to his e-mail address, he has -- he has

14  social media that he maintained.  We probably best not get into

15  that issue right now but that's part of the dispute here.  He had

16  social media that he maintained on major platforms.

17        In addition, he continued to participate in being an

18  expert in this space.  For example, he was quoted in media.  And

19  most importantly, he continued to engage with clients and

20  potential clients.  And, again, this is a -- this is not walking

21  in the store and buying a loaf of bread for $2.  These are complex

22  styles of promotion.  Not everyone is the right fit.  And so he

23  does have to do a decent amount of work but that's all used in

24  commerce.  And we feel very strongly and the law makes it clear

25  that that is use in commerce for purposes of this style of case.

1          THE COURT:  It does not seem to me to be overly
2  burdensome.  Well, let me back up.

3          Another part of what they're seeking and that you have
4  brought that as tax records and things of that nature.  It seems
5  to me the plaintiff is entitled to know, in spite of the argument
6  that he was engaged in commerce through the promotion, et cetera,
7  not just every time he made a dollar but he was engaged in
8  commerce.  Let's accept that for a moment.  But it seems to me the
9  plaintiff would be entitled to know to what extent he was actually
10 selling product.  And I'll use the term "product" whether it means
11 services, goods, whatever.

12         And it seems to me that it would not be overly
13 burdensome for him to over some time frame -- I don't -- I
14 personally am not sure we need a 30- or 40-year history.  To me
15 perhaps the three years or so before they registered the name and
16 maybe this last three or four years ago to see if it's still being
17 used, those become hot times that this is particularly relevant.
18 But maybe something more than that.  I'll hear from the plaintiff
19 what they think are the relevant time frames.

20         But to require of Mr. Hudson to -- to identify specific
21 transactions during those periods, there should be some record
22 somewhere of that happening and perhaps the Conti -- I have not
23 looked through the Conti documents.  I don't know what's there.
24 But perhaps the Conti documents do that.

25         But it seems to me that if he can't do that, if that's

1   just not doable, then that's what opens the door for me to his

2   personal financial records because that's the next best way of

3   getting it.  And as I've said, I take issue with some of what the

4   plaintiff has done in the latter stages trying to get to the

5   discovery of these matters.  But in fairness to them, I understand

6   some frustration on their part in feeling -- trying to use every

7   avenue they can to lock him down.  Because, let's remember, this

8   is about locking each of you down in terms of what you're going to

9   do at trial.

10           And in the final analysis, in my final ruling on this,

11  whatever is produced that I think is responsive, is what you're

12  going to be bound to at trial.  So if there's something that has

13  not been disclosed and identified as evidence of -- of this

14  particular element of the claim, you're not going to be able to

15  use that at trial.  And that's why -- because I don't believe in

16  trial by ambush.

17           I mean, the way we conduct civil trials in this country

18  now is we've got full discovery and everyone should know going in

19  what everyone else has.  And so, that's the point here.  If the

20  reports aren't there -- and I'm not asking to create something

21  that's not there.  But if its there, you're likely going to want

22  to use that at trial.  And if you are, they're entitled to know it

23  before they get to trial.  So that's my concern here, is this

24  doable?  Can you -- and it seems to me -- and I don't understand

25  fully Mr. Hudson's business.  But it does seem to me that a person

1  who is presenting himself in this way, earning a living doing

2  this, there should be some record of his transactions.

3         MR. MENHART:  Yes.  So the reality that we are facing is

4  that if we have it, we've produced it.

5         THE COURT:  Okay.

6         MR. MENHART:  That's it.  I wish I had more to add to

7  that.  But -- and, you know, look, we're having a very honest

8  conversation here.  From my perspective as Mr. Hudson's attorney,

9  I wish I had a lot more --

10         THE COURT:  Right.

11         MR. MENHART:  -- to produce.

12         THE COURT:  That's a fair response.  And I appreciate

13  your response.  That's a very fair response.  And there's going to

14  some of this on the other side, too.  The plaintiff, in response

15  to some of your requests, saying we have given you everything

16  there is.  You think there should be more.  There's not.

17         And that's the point I was making a moment ago.  If

18  you're telling me you've given me everything you've got, don't

19  bring more to trial because it's not coming into evidence.

20         But for me, in all honesty, wading through 40,000 pages

21  of documents or 40,000 documents, whatever it was, is -- is overly

22  burdensome on a party to find what you contend reflects a

23  transaction in selling or producing of goods or services.  And I

24  think it's a fair expectation on their part that you would be able

25  to disclose that to them.

1          Let me turn to the plaintiffs.  I'm going to make some
2     of his arguments against y'all so don't feel bad that I am making
3     yours against him.

4          But let me get you guys' reaction to this.  Am I missing
5     the boat, or is this the real crux of your concern or what you're
6     trying to get at?

7          MR. MCLAUGHLIN:  It is, Your Honor.  You've stated it
8     exactly.  We're trying to figure out what exactly Mr. Hudson has
9     been doing to claim, as he has in his pleadings, that he has
10    continuously rendered services under the Nubank name since 1978.
11    And his own witnesses that he produced for deposition have said
12    they haven't worked with him or are not aware of any services he
13    has rendered since 2008, 2009 period.

14         He himself at his deposition has said he's long retired
15    and it's been years since he's rendered services.  And the
16    documents that we've received don't have any evidence of any
17    recent provision of services under the Nubank name.

18         I'm not sure which contract Mr. Menhart's referring to
19    that was a Nubank invoice.  I haven't seen that.  I suppose it's
20    possible I missed it.  I saw a Bank Mark Nubank invoice but not a
21    Nubank invoice.  And that's consist with Ms. Conti's declaration
22    that we submitted, who is the provider of the most recent set of
23    documents, who says very clearly -- who worked with Mr. Hudson
24    until 2010 -- we didn't do work under Nubank.  When we did
25    contracts, it was a different entity name.  It was under Bank

1   Mark.

2         So we're just trying to understand that discrepancy.  On

3   the one hand they're taking the position in their pleadings that

4   he has continuously rendered these service and on the other hand

5   saying but we don't have any evidence of it.  And we understand

6   that Mr. Menhart has said to us similar to what he has said to the

7   Court; we don't have any additional documents.  If we had them, we

8   would turn them over.

9         And that led to our request, okay, give us the tax

10  returns.  We need some evidence.  Because -- because to me you

11  can't have it both ways.  You can't say you're rendering services.

12  You have contracts.  You have clients.  You've provided these

13  services but no evidence whatsoever of them.  And I think we are

14  entitled to that, because I think that that is going to be highly

15  relevant at summary judgment.  If there's no evidence, then we

16  think we have a very strong case for summary judgment.  We haven't

17  seen the evidence.  And if there isn't any, then just say so.  And

18  that's what I think the discovery responses need to say.

19         THE COURT:  Let me ask you this:  What is -- is there --

20  I suggested there may be as opposed to 40 years worth of

21  documents, there may be critical time frames that will come into

22  play here for purposes of summary judgment and for trial, that for

23  you are determinative almost of the issues that would be before

24  the Court.

25         Are there such time frames?

1          MR. MCLAUGHLIN:  We've asked, Your Honor, for I think
2   going back to 2013 or '14.  That's when our client first launched
3   its credit card under the common law infringement or common law
4   right argument that has been made in the counterclaims.  They have
5   to show continuous use of the mark.  And under our defense of
6   abandonment, that if they have not used the mark for a continuous
7   period of three years, that is evidence of abandonment.

8          So we thought we were being reasonable in going back to
9   2014 for -- for these documents.  And, again, the tax returns --
10  I've not heard that there's a burden in producing the tax return
11  materials.  There's not a burden in producing other documents.
12  They're just saying they don't exist.

13         So we're not looking to go back 30 years.  We've seen
14  the historical documents.  We -- you know, we could accept, for
15  the sake of argument, he rendered -- Mr. Hudson rendered services
16  under certain names.  Although, from everything we've seen, the
17  actual contracts and checks that are cut are not to Nubank,
18  they're under a different name.  But we don't think that's the
19  most relevant time period.  We think the more recent years is the
20  more relevant time period.

21         THE COURT:  Mr. Menhart, you've stated in your brief and
22  I've read that and I'm familiar with your position and understand
23  your position relative to tax records and so forth.

24         Is there any other objection you have to taxes other
25  than what you've stated in the papers?

1    MR. MENHART:  Well, our position is -- I will state for
2    the record that I think the position of the papers is relatively
3    clear.  And it's quite a bit of law and statutory authority that
4    suggests that tax records shouldn't be disclosed.

5         That being said, Your Honor, no, I don't think that
6    there is -- is it a technical burden?  No, I don't think so.  But
7    that is -- I'm concerned that the defendant has provided a lot of
8    evidence as to what he has done and what he hasn't done.

9         And, Your Honor, I want to try very hard to avoid
10   getting -- going down this rabbit hole.  But bluntly -- and I'm
11   going to say this one time and I'll zip my lip -- we are very
12   concerned about harassment here.  And -- and I'm going to try to
13   be as polite as I possibly can.

14        This is an eight-year process, where this plaintiff has
15   been harassing my client, a small business person, and the list is
16   very long.  And with all due respect to the plaintiff -- I'm not
17   going to say anything more about it -- but with all due respect,
18   this feels like a needle more than it feels like a need.  And that
19   is our concern here.  And at the end of the day, they have the
20   deposition testimony.

21        We, ourselves, we took third-party -- excuse me --
22   third-party deponents of his own clients to demonstrate some of
23   this -- this evidence.  So, by the way, I'm looking at the invoice
24   right here.  It was from 2019, to clarify my preference from
25   previously and just for purposes of the record, it's marked as

1 "Confidential."  But I'll give the Bates Number, Hudson O --

2 0001329 is the invoice that Mr. Hudson has already produced.

3        So to get back to your question here, sir, the tax

4 returns aren't going to show anything more than what is already

5 shown in the invoice.  So we just don't see why we have to pile on

6 to something that we've already produced and particularly because

7 we are concerned about the harassment element.  And I'm going to

8 leave it at that for purposes of this hearing.

9        THE COURT:  This is -- pardon me for doing this but it

10 just -- it's what strikes as sometimes it's sitting on the outside

11 looking in makes you see these things that's harder to see sitting

12 on the inside looking out, or looking among yourselves.  But if

13 he's -- if he's basically senior plus and he's basically retired

14 and not really doing that much anymore, is there not a way to just

15 settle this thing?

16        I mean, you guys pay them -- pay him something for the

17 Nubank mark and everybody go their merry way?  I mean, I cannot

18 imagine the costs associated with this from both sides to fight

19 over something if he's ready to -- you know, I'm getting close to

20 where I'd sell you my robe real cheap and go home happy and you

21 can have my robe.

22        And I -- you know, why can't he sell Nubank and be --

23 and be done with this, or has this become a matter of there's so

24 many personal feelings that he feels like he's being picked on by

25 them; they feel like they don't like him or whatever so we're

1  going to fight about it?  But, my heavens, I just can't imagine
2  that there isn't some middle ground here.

3          MR. MENHART:  Your Honor, I want to be careful about
4  having any specifics with the fact finder element part of these
5  conversations.

6          THE COURT:  Right.

7          MR. MENHART:  But the settlement conversations have not
8  been positive.

9          THE COURT:  Okay.  That's fine.

10          MR. MENHART:  I think I can leave it at that.  And what
11 I will say to you.  And, again, I wanted to be careful not to go
12 too far down the road here, surprisingly so from the defendant's
13 perspective.  The defendant has taken his position.  The other
14 side has been -- I'm trying to be polite here.  The other side has
15 been needling him for eight years and they've never made an offer.
16 Period.  That's where we're at.

17          THE COURT:  Any chance of y'all sitting down with a
18 mediator?  And, I mean, I will send you to a magistrate judge.  It
19 would not cost you a dime.  I'm having a hard time seeing -- I
20 mean --

21          MR. MCLAUGHLIN:  Your Honor, I just have to respond.
22 And, again, without getting into details.  We've made an offer.
23 We've made an offer before Mr. Hudson submitted his answer to the
24 complaint.  We've not received a counteroffer.  And so, we
25 can't -- we can't do more than that.

1        THE COURT:  Right.

2        MR. MCLAUGHLIN:  And we have reached out to Mr. Menhart

3   subsequently and asked for an "appetite" for exactly what you're

4   suggesting and we don't -- we're not there.  So we are perfectly

5   willing.  We think it makes sense.  I agree with Your Honor's

6   assessment.  We've had the same assessment since day one that this

7   does not seem to be a dispute worth going to trial over, given

8   what Mr. Hudson himself has said his interests currently are.  But

9   here we are.

10       THE COURT:  What I'm going to do -- I'm going to -- at

11  the end of the day I'm going to make a ruling on the discovery

12  matters.  But I'm also going to -- seriously, I mean, just -- I

13  feel like I owe this to your clients.  I'm going to refer you to a

14  magistrate judge for mediation.  And what I'm going to ask you to

15  do and you don't have to do this because you're -- you make your

16  own decisions in how you deal with your clients.  But just with

17  what -- I'm going to order both of you to do -- I'm going to order

18  both of you to do some stuff today regarding discovery unless

19  somebody really turns me around from how I felt walking in the

20  room.  And just do a rough estimation for your clients, what it's

21  going to costs them before you have to do it and see if mediation

22  looks any better then -- I mean, it seems to me back in the day

23  before magistrate judges would do mediation for us, we

24  occasionally did -- and this is really bizarre but we did it.  We

25  did settlement conferences.  I mean, I sat down with the parties

1   and went through a long deal of their understanding that I was

2   going to say things about the case, yet I was going to be the

3   person setting on the bench during the trial.  How comfortable are

4   they with that?  Folks were comfortable with it.  We'd do it.

5          And the number of times I would have a party -- and

6   quite honestly a corporate person on one side would say to me --

7   you know, because this would occur -- we'd get to pretrial or

8   something -- that's when the light would go on.  They would say to

9   me, Judge, if you had told me this -- if we could have had this

10  conversation eight months before I was $100,000 into this

11  litigation, I could have put more money on the table and we could

12  have gotten this thing settled.  If someone had just told me that.

13         And, of course, the funny part of this -- and I promise

14  I'm not going to tell stories all day.  Last one.  But the funny

15  part of this to me was almost without exception as they're walking

16  out of the room, the lawyers would hold back and they would slide

17  over close to me and say, "I cannot believe that guy.  I said that

18  to him 5,000 times and it's like he never heard it before."  So I

19  know you guys are talking to your clients and tell them.

20         But sometimes having another person who is not in the

21  fray, say to them, come on, guys, there's a better way here and

22  sometimes it helps.  Okay.  I will quit trying to sell that to

23  you.  I'll put it out there.  Because I just -- wow, this is one

24  where -- I mean, the perception of our system matters to me and I

25  just want people to feel like they were served by what happens in

1  this place.  And I think these folks would be better served with
2  me out of the picture.

3        But anyway, the other -- let's see.  Another issue that
4  was raised and I think it was raised by both of you.  And it was a
5  concern about the production of documents that you received in
6  third-party subpoenas.  The Conti issue was one.  And I think
7  Conti has now produced -- actually turned over the documents to
8  both of you is my understanding.  But there's some concern that
9  documents obtained through third-party subpoenas were not being
10 turned over and those should be.  I mean, those should be both
11 ways.  That cuts both ways and those should go both ways.

12        Moving to the defendant's motion to compel, the first
13 part of that dealt with the request for admissions.  And I -- and
14 the primary thing there was the general objections that y'all
15 objected to that they had done.  And I think you're right, there
16 were some general objections.  There were some other objections
17 that were not satisfactory in my view but I'm not going to burrow
18 down into those because my feeling is that what ended up happening
19 is that plaintiffs -- the biggest one was definitions.  And what
20 plaintiffs did was they chose to assign a definition and then
21 responded based on that definition.  And so, there's at least --
22 to me that's at least being forthright in terms of this is how I
23 dealt with it and this is my answer based on that.  If I'm wrong,
24 then tell me and we'll do it differently.  So that part is not
25 troublesome to me.

1        Where it gets harder for me is in the request for
2   productions of the plaintiff's communications.  And this --
3   this -- there's several facets to this particular part of it.  And
4   my first question is -- is, Mr. Menhart, to you, in terms of the
5   relevance of the communications, particularly on a time period
6   basis.  I mean, at this time, these communications may be relevant
7   for these purposes at this time for these purposes and so forth.
8   I've got some idea of why they may be.  But I would just like to
9   hear from you your perspective on why you need these
10  communications.

11       And let's focus -- actually, let's break this apart.
12  Let's focus, first, on the intra-business communications when they
13  talked about your client basically.  You know, I think that's the
14  first area that you had raised is where their communications about
15  your client that may have occurred within the business before we
16  get to the other e-mails and so forth.

17       MR. MENHART:  Sure.  So.  Your Honor, this -- as
18  previously mentioned, this plaintiff has been -- again, I'm trying
19  to be polite when I say -- harassing Mr. Hudson for years.  And
20  there's no question.  Because they've admitted in their own
21  depositions that they've had communications about how they were
22  attempting to acquire the domain name for eight years.  And that's
23  why the time period is relevant because we all have to plan for it
24  to go to trial.

25       THE COURT:  Right.

1    MR. MENHART:  We all have to plan for that.  I think a
2    jury is going to be extremely interested in knowing how they were
3    internally planning to engage with Mr. Hudson over a very long
4    period of time.  They have not produced -- they have produced --
5    in my belief, it is one e-mail.  One e-mail over the course of
6    eight years.  And they themselves have admitted that they have
7    routinely made efforts to purchase the domain name.  They've
8    engaged with LinkedIn.  They've stripped him of his LinkedIn
9    account.  He could have -- again, we're having an honest
10   conversation.  My client should have lawyered up at that time.  He
11   didn't.  That was a mistake on my client's part.  We've had that
12   conversation.  So -- but they engaged -- they started that.  They
13   engaged that.

14        So there's a wide variety of communications.  And my
15   suspicion is there are thousands if not tens of thousands
16   communications demonstrating that they are trying to wear him down
17   and get him to the point where he effectively had to give up the
18   domain name.  That's concern we have.  We think it's
19   extraordinarily relevant when it comes to intention -- and trying
20   to be polite.

21        If they would have produced 100 e-mails or 200 e-mails
22   or shown even a remote attempt to show some type of relevance,
23   maybe we wouldn't have this conversation.  But this is clear
24   stonewall.  There's no question or doubt about it.  There are
25   thousands of e-mails that are relevant here.  I don't know if we

1   are specifically talking about these other issues.  But we have

2   also tried to restrict the e-mails extraordinarily narrowly.

3         We've only asked for two witnesses; one trademark, the

4   trademark at issue in this case; a domain name, Nubank.com and

5   another domain name, Nubank.org.  I don't know what else I could

6   do to have it more narrowed than that in a request.  And we truly

7   did think about some others things we could ask for.  But we said,

8   look, at some point we're probably going to have to defend this in

9   front of a Court.  And I can tell you, Your Honor, I have no other

10  idea what I could possibly do to make it more narrow than that.

11  Relevant witnesses, relevant trademark, relevant domain names and

12  that's it.  That's all we're asking for.

13        THE COURT:  And let's -- let's focus on communications

14  that you think may have occurred within the company about ways to

15  get this -- this name -- where to get -- way to get the trade

16  name.

17        Those -- that would not go to whether or not he had a

18  valid common law mark.  Is that -- would you agree with that?

19        MR. MENHART:  Unfortunately, Your Honor, I do not agree.

20        THE COURT:  Okay.

21        MR. MENHART:  My strong suspicion is there's a variety

22  of e-mails that probably suggest that they know that he's using

23  the mark in commerce.  That they saw all the press coverage that

24  he had.  They saw the website.  They knew everything about how he

25  was operating in the United States.  But their plan was that they

 1  were going to wear him down, again, in my opinion, harass him and
 2  engage in that type of -- and look, again, I personally think that
 3  that's what we're doing right now.  We're all sitting here in a
 4  courtroom in the Northern District of Georgia.  This is part of
 5  that eight-year plan.  So, yes, unfortunately, these are relevant
 6  and I strongly suspect there's a variety of communications where
 7  common law rights were discussed by some of the plaintiff's
 8  witnesses.

 9          THE COURT:  Moving to the -- to the e-mails and the
10  LinkedIn accounts, it does seem to me there would have to be some
11  way to refine the search there to make it more focused.  I mean, I
12  just -- and I am not a technology expert.  So feel free to educate
13  me.  But the fact that these terms are found within the e-mail
14  addresses of the persons whose accounts you are searching, it
15  seems a bit problematic to me.  And I'm sure there's a way you
16  could omit those or whatever.  But that you are dealing with a
17  company that uses the term Nubank in association with his
18  business.

19          To me, that is terribly broad for all of these peoples'
20  e-mails when we they're working in a business called Nubank.  We
21  have searches all the time of documents and repositories of
22  information and the parties endeavor to design search terms that
23  will help to ensure we get to matters -- I mean, I can see running
24  a search like this and these guys having to do a document review
25  of hundreds of thousands of documents if you search every e-mail

1 that these people did.

2       Isn't there -- isn't it possible to come up with search
3 terms that could narrow this and make that a more manageable task?

4       MR. MENHART:  It is difficult in this case because we're
5 talking about the actual business name.  Again, this is relatively
6 rare here because this business has come in to the United States
7 and they said this business name is ours.  So, unfortunately,
8 that's relevant.

9       To address how you could search the e-mails there's a
10 variety of ways.  And the most basic use of a software could
11 handle this.  You could effectively search the text of the e-mail.
12 Don't search the e-mail address or anything like that.  Search the
13 text of the e-mail.

14       Of the few e-mails that we have seen from Ms. Junquiera
15 and Mr. Velez, they do not use signature lines that say Nubank or
16 anything like that.  So this is very simple.  This is very simple
17 e-discovery work.  It could be the text of the word Nubank within
18 the text of the e-mail.  You could tell the software to ignore the
19 domain names under which the e-mail addresses are held and that's
20 it.

21       Your Honor, I will say I truly, along with colleagues
22 not necessarily of record of this case -- I've had the
23 conversation with colleagues:  Is there anything else that you
24 think I could do to limit this?  And we all effectively threw our
25 hands up because the problem is it's the name of the business that

1   they are coming in and trying to take from the defendant.

2          So we are open to suggestions.  We truly are.  But we

3   have thought about this issue and we have truly -- with serious

4   trouble coming up with any way to limit it in a way that would not

5   be harmful to my client's discovery requests.  So certainly we are

6   open to your thoughts on that.

7          THE COURT:  I've thought about it now for five minutes

8   because when we started, that's when I started thinking about it.

9   The first two that came up in my mind were trademark and common

10  law.  I mean, trademark -- I mean, if I am as Nubank writing to a

11  potential customer offering that Nubank would like to do this for

12  you or Nubank offers these services or Nubank does this, I

13  wouldn't use the name trademark in doing any of that.

14         But if I were talking about your client, there's a

15  strong possibility somewhere in there I'd say something about

16  trademark.  We don't think he has a -- even mark, that he has the

17  rights to this mark.  There's no common law.  He can't establish a

18  common law.  Those are two terms that just popped into my head.  I

19  don't know.  You could probably tell me reasons those aren't good.

20  But it seems to me that those terms alone could perhaps cut this

21  down tremendously.

22         Because if you're operating as an entity known as

23  Nubank, I can see even in the body of the text, when you're making

24  a pitch or whatever, saying -- you wouldn't say I want to do this

25  for you.  They'd say Nubank can offer this to you.  I don't know

1  enough about your clients so it may make no sense.  But it just --
2  generally I can see that happening.  And that's why just using the
3  term Nubank it seems to me is awfully broad and it may be some way
4  that could be cut back.  I don't know.  And I may have missed the
5  boat there.

6      MR. MENHART:  I understand I am doing a lot of the
7  talking but we are open to that.  We always have been.  We have
8  had a lot of meet and confers.  Hours and hours and hours and
9  hours.  This was never suggested as a way to limit it.  And so, we
10  didn't have that conversation.

11      But I understand the Court's perspective.  Defendant is
12  prepared to have a conversation about key words that we could
13  further limit.  I think at this point I would just have to suggest
14  to the Court we may have to have that conversation on our own, get
15  back to you and see if we can work it out.  But at this point
16  there just has not been any conversation because they have been
17  unwilling to produce any e-mails.  That's our perspective.  But
18  certainly the other side can share their perspective with you.

19      THE COURT:  My typical approach if we -- let's say we
20  come out is that I ask the parties if you could agree on search
21  terms.  If you can't, then you each submit to me your proposed
22  search terms and I select the ones that will be used.

23      Let me turn to plaintiff.  Do you oppose or do you
24  contend they're not entitled to have access to these types of
25  communications that are at issue here?

1          MR. ANDREWS:  Your Honor, our position is -- forgive me.
2    I'm sorry.

3          THE COURT:  That's okay.

4          MR. ANDREWS:  Our position is that we have produced
5    them.  That is what the critical thing to understand here is that
6    after all the back and forth, and there was substantial meet and
7    confer with respect to Request Number 15 and 29, we told the
8    defendant that we would go and get all of the communications that
9    were not privileged, responsive to 15 and 29 concerning
10   Mr. Hudson's use of the Nubank.com domain, the Nubank mark, this
11   litigation, and the facts pleaded by Nubank in the complaint.

12         And what we did there -- I'm hoping to build here a
13   little bit on Your Honor's brainstorming regarding search terms.
14   We did something a little bit different but I think it actually
15   gets to the same place -- probably would be shown to get to the
16   same place as what we've all been talking about earlier.  We did a
17   search for the word "Hudson."  So we got -- that presumably got
18   all of the intra-company communications concerning the defendant
19   except for the privileged ones.  They're produced.

20         THE COURT:  Was that just one that was produced?  The
21   suggestion was made that only one e-mail was produced pursuant to
22   that.

23         MR. MENHART:  Well, let me clarify that.

24         THE COURT:  Okay.

25         MR. MENHART:  Some of the e-mails they produced were

1  e-mails between the parties that we already had.

2  THE COURT:  Okay.

3  MR. MENHART:  So to make sure that's clear on the

4  record.  They produced, I believe, one that was only between the

5  two of them.  That's my position right now.  I'll admit to the

6  Court I might be off by one or two but I'm not off by 100.

7  THE COURT:  Okay.

8  MR. ANDREWS:  So building on that, Your Honor, the

9  witnesses at the deposition, that would be the founders of the

10  plaintiff, David Velez and Cristina Junquiera, both testified that

11  it's just simply not the case that they spent a lot of time

12  thinking about Mr. Hudson.  He's a fairly small feature in

13  their -- in their lives and their business.  And so, as it's in

14  our papers, we just can't produce what we don't have.  They

15  weren't spending the time that it's been supposed that they were

16  spending or the energy writing about him.

17  If Mr. Hudson's name showed up in an e-mail and it

18  wasn't privileged, and that would include of course in-house

19  counsel and conversations about, you know, to the extent -- and

20  let's face it, Mr. Hudson's -- the contract that we're dealing

21  with here has been legal pretty much from the outset.  And,

22  therefore, you're going to expect that a lot of the conversations

23  did involve in-house counsel and involved pursuit of legal advice.

24  So that explains some of why, you know, the volume isn't what

25  perhaps the other side expects.

1        But, again, the bigger driver here is Mr. Hudson hasn't
2   been the -- as significant in the minds of the plaintiff's
3   personnel as perhaps he imagines.  So that's 15 and 29.

4        Then we get to 36 to 43 and, Your Honor, I really don't
5   have much to add to what Your Honor has said.  The upshot of those
6   gets basically -- you know, when -- when it's said that those
7   requests go to two individuals' e-mail accounts, maybe that -- I
8   mean, that does seem to be true.  It's just basically the way it's
9   worded is:  Give us their entire e-mail accounts.  I think Your
10  Honor recognizes that.  I have nothing to add.  And we did it.

11       And I don't want to repeat what's in the papers because
12  Your Honor's clearly read them.  But on September 2nd, there was a
13  meet and confer that went over an hour.  And during that -- when
14  we talked about 36 to 43, it was agreed we're tabling that.
15  Nobody is pursuing that for right now.  I'm not trying to say
16  there was any binding commitment but it was -- it was tabled.  And
17  when it came back -- when that issue arose again, you know, we
18  asked, what can we do?  And -- and what we were told -- and this
19  is in quotes in my notes, so I could raise my right hand and
20  testify to this.  We ever had told -- and the quote is in the
21  papers.  We were told that there was not -- that the other side
22  was not going to make any proposals to narrow the searches.

23       So we welcome the discussion today about how to do it.
24  My position is that we've produced what there is that's relevant
25  by any kind of a reasonable search insofar as we searched "Hudson"

1   and produced those conversations in response to 15 and 29.  And

2   the topic today of trying to go into the e-mail accounts for

3   something else I think is unnecessary.  But it hasn't -- but to

4   the extent it hasn't happened before, it has not been for lack of

5   our trying.

6          THE COURT:  Hudson's an obvious term.  I didn't think --

7   but that's an obvious term that would be used.

8          Was there not an obligation to provide a privilege log

9   if you were keeping matters back based on privilege from the --

10          MR. ANDREWS:  It's my understanding is both sides are

11  exchanging privilege logs soon.

12          THE COURT:  So you acknowledge that there would be a

13  duty to provide a privilege log to the extent you're withholding

14  based on privilege?

15          MR. ANDREWS:  Yes.

16          THE COURT:  I'm going to show my ignorance here because

17  I have no idea what Slack is.  So my law clerk was kind enough to

18  explain it to me to some extent.

19          But is there -- is there a need to go into the Slack

20  account as opposed to just look through the general e-mail

21  account?

22          MR. MENHART:  Yes.  The Slack account is effectively --

23  the old school way of referring to it would sort of an intranet

24  where it's sort of an internal server by which people communicate.

25          THE COURT:  With an IM type of account.

1        MR. MENHART:  That's exactly right.

2        If you remember AOL, Instant Messenger, back in the day,

3   similar style.  Obviously much more sophisticated and advanced

4   than back in the day.  And the Slack -- and there's testimony on

5   this as well.  This is true of virtually every business on the

6   planet.  The Slack tends to have a lot of messages, internal

7   messages between everybody.  And there's no question in my mind

8   that there are relevant messages in the Slack.  Period.

9        MR. ANDREWS:  Your Honor, the Slack issue was only

10  raised in the reply brief.  And I understand that -- that

11  Mr. Menhart would say that's because it came up at a deposition.

12  It's not my point to criticize him.

13        It is, though, my point to say that there's case law as

14  well as factual development we could do on the burden associated

15  with trying to gather the Slack data and if -- with respect to

16  that issue, if Your Honor would, we'd welcome the opportunity to

17  present some of that law and to present why the Slack in this case

18  is not proportional to the burden that it would produce.

19        THE COURT:  Okay.  There was also a request by the

20  plaintiff to file a surreply on the motion to compel.  I read what

21  both of you submitted on that.  And the reality is that I'm not

22  going to allow a surreply, because the issues raised therein are

23  not going to be determinative or effect in any way the decision I

24  make on the discovery.

25        I understand the feeling or the need that folks have to

1  defend themselves in the level beyond -- and I appreciate and
2  understand that.  But those are issues I don't feel a need to
3  really delve into to get us where we need to be in terms of
4  getting our discovery moving.

5        After the motions to compel were filed, there was a
6  subsequent letter pursuant to our discovery process that the --
7  that plaintiff's counsel had submitted and it dealt with -- you
8  had the third request for admissions and also concerns about the
9  responses to the second request for admissions.  And I think it
10 also mentioned Ms. Conti's documents as well.  We've already
11 talked about the Conti documents.

12       But as to the third request for admissions, I am -- I'm
13 not going to require the defendant to respond to those because I
14 do think they are unduly burdensome and I think they are
15 harassing.  But having said that, in fairness to the plaintiff, I
16 understand why they sent them.  Because as I said earlier, I think
17 it's not -- I don't think there's been a clear answer yet from the
18 defendant.  And that's what I'm going to require as part of the
19 order here, to really identify that interstate commerce that's
20 been participated in by your client.

21       And I think this was -- I said I wasn't going to tell
22 more stories but this will be a short one.  I Promise.  When I
23 practiced law, I practiced law with a guy who used to drive me
24 crazy.  Because he insisted on, I mean, tightening every loose
25 end.  And in a deposition he would keep asking the question a

1   different way.  We had the answer we wanted.  And I keep thinking:
2   Don't ask them again.  They'll change their minds.  But he just --
3   he wasn't going to leave a loose end.

4           And this is a little bit -- and I'm not being critical
5   here.  This is a little bit.  You think they have not -- they said
6   they've shown you everything they've got.  You don't think they've
7   shown you this yet.  But just in case you're wrong about that, you
8   want them to admit they haven't shown you this yet.  And that's
9   what they're -- they are faced with before.  And you've got to
10  cover every county, because if you don't cover every county, they
11  will say, well, they're doing business here.  I understand all of
12  that.  But I also think there's a better way of getting there.
13  And I think that's the way we're going here and what I'm going to
14  direct with my findings.

15          That being said, I think that the plaintiff did have
16  some legitimate concerns about the responses on the second request
17  for admission.  And I'm not, again, going to go through those
18  individually.  But I'll just use a couple of examples.  And I want
19  to say in doing this I think both sides were a little bit cute or
20  evasive in some of the responses in terms of saying we don't
21  really know what this means or we don't really know what that
22  means.  Some of that was pretty obvious what it meant.  And I
23  thought it was just a way of evading giving direct answers.  And
24  there were some here I think have a little more substance to them.
25  And an example that I pulled out was, I think, the second request

1   asked if the defendant had sold -- sold any good bearing the term

2   Nubank?  And there was a weak objection, I thought, to not knowing

3   what goods were.  But said, we think it includes these things.

4   And that's fine because I think the plaintiff did some of that

5   kind of stuff in theirs.  But never answered the question whether

6   it sold that item.  It said, we were doing these things in

7   commerce, whatever.  But that wasn't it.  The question was, did

8   you sell anything?  And you never answered that question.  And I

9   think the plaintiff's entitled to an answer to that question.  And

10  there are a number of those kinds of questions in there.  I think

11  that's fair game.  I think it's a question they're entitled to

12  have an answer to and it was not.

13          And another example was when a proffered fact for

14  admission was made, the response was not to that fact but would

15  admit a different fact and it wasn't what they were actually

16  asking.  So, again, it's sort of dodging the bullet and not a

17  fair -- fair response.

18          So I think there's going to have to be a supplementation

19  of those responses in a good faith effort to read using the common

20  ordinary meanings of words and applying those and doing answers.

21          I'm going to hear from both of you again but let me tell

22  you where I see us headed and give you a chance to respond to

23  this.

24          I see my -- well, I'm going to refer you to a magistrate

25  judge for mediation and encourage you to do that.  And let me tell

1    you if you -- if you guys are really willing to do this in good
2    faith and to encourage your clients to do it with an open mind, I
3    will delay you having to do what I'm about to order you to do
4    until you've done a mediation.  So that you can say to your
5    clients we're saving this money.  The Judge is not going to make
6    us spend this money if we can get it settled.  Because it's crazy
7    for you to spend the money and then go settle it.  So the Judge
8    has said he believes strongly enough there's a chance of settling
9    this.  He wants to save you some money.  So your clients -- what
10   you'll say is the Judge and I want to save you some money.  That's
11   what you'll say.  I'm good with that.  In fact, you can say it was
12   your idea.  I'm good with that.  Use this the best way you can to
13   get us where we need to be.

14          But assuming it doesn't work after we do that, here's
15   the things I'm going to be looking for from you.  And I will issue
16   an order that will define all of these things.  But is going to be
17   to require the parties to confer regarding some search terms that
18   would be used for the searches of the e-mail accounts and the
19   LinkedIn.  The parties -- both parties to the extent that you
20   declined to produce anything as a result of privilege, are going
21   to be required to submit privilege logs.

22          The -- I didn't ask this question earlier.  Let me be
23   sure.  Are your responses that you've given about the searches of
24   e-mails and so forth, would they be the same on this specific
25   issue of searches with regard to Nubank.org?  Did that change

1   anything about the way the searches would have been conducted or

2   anything?  I'm assuming not.

3            MR. MCLAUGHLIN:  I don't believe so, Your Honor.

4            THE COURT:  Okay.  From the defendant's perspective I'm

5   going to require that the defendant file a supplemental response

6   to the second request for production and the second request for

7   admissions, also those three interrogatories that were objected

8   to.  Those all go hand-in-hand.  It's all about the invoices.

9            And it's -- what I -- what I would really like for the

10  defendant to do on that is I'm going to refine y'all's request.  I

11  would like for you to produce, to the extent you can, invoices and

12  whether those invoices were paid or not for the period that

13  they've requested.  Not -- not -- and I realize you've produced

14  documents that your position is these were marketing and

15  engagements and so forth.  But I want to see where money changed

16  hands, where there was quid pro quo; there was a service rendered

17  and some value passed back to Mr. Hudson on that.  So that's

18  really what I would like for you to do there.

19           And to that extent I don't think it's burdensome because

20  you've talked about it in your objections.  They're asking us to

21  create a document that we don't create in the ordinary course and

22  so forth.  And I'd like for you to take a position -- and let me

23  tell you what I'm thinking about here and let you respond to it

24  and let you guys react to it, too.

25           I mean, in my view where his tax records get relevant is

1  if you're claiming he made money that you can't show otherwise.
2  So if whatever invoices you submit, you're willing to accept that
3  that's the only evidence you will offer that he made money off the
4  Nubank name, I'm not so inclined to make you turnover tax records.
5  If that's all you've got, that's all you've got.

6      And that's sort of where I am.  Because, I mean, what
7  you get out of the tax records is maybe all his income or
8  whatever, which is not really relevant.  What's relevant is, was
9  he making any money under the Nubank name?  And if he's got
10 invoices and he feels like he made more money than that, then he
11 is going to have to show -- he's going to have to show his tax
12 returns.  And then you can question him about that.

13     But if he goes with the invoices, I don't know if you
14 get any better than that with the tax returns.  That's my
15 inclination is to -- it's almost a two-step process.  If he
16 submits the invoices, submit those and -- and I'll let you take a
17 look at them and say, okay, Judge, we're good; or, Judge, we think
18 we should still get a shot at the tax records and here's why and I
19 will let you respond to that.  So we will do this in a two-step
20 phase.

21     The same with Slack.  I will let you guys on the
22 plaintiff's side give me a little brief on why I shouldn't require
23 Slack.

24     And then on the defense side, Mr. Menhart, I will let
25 you just do a brief response to that.  And so I'll hold back on

1  that until I've seen those.

2          As I've already said, I'll require both parties to

3  produce documents that they received through third-party

4  subpoenas.

5          Okay.  That's where I see us being and where I see us

6  headed.  Let me hear from plaintiff in terms of concerns you've

7  got about that or anything else I've missed.

8          MR. MCLAUGHLIN:  Your Honor, we appreciate the ruling.

9  The two-step process, I'm inclined to think to your point if we

10  don't get invoices, then we don't need to go further.

11          I've got the one caveat, but I'll wait -- I will reserve

12  judgment.  If it's sort of what we heard, well, maybe the invoices

13  are under a different name.  And so that's where -- I just don't

14  want to be met with, well, we didn't produce those invoices but we

15  have these other invoices but we were really operating under this

16  different name.  And those would have been reflected in our tax

17  returns but -- and so that's what we're trying to foreclose.

18          THE COURT:  See, that's what I'm trying to avoid.

19  Because I think if we get into the tax returns, we're running down

20  where every dollar came from.  To me it's what was done under

21  Nubank and the invoices are best evidence of that.  And in

22  fairness to your client if you've got the invoices and you think

23  there's other evidence that you would intend -- you would intend

24  to rely on, it may be the tax returns.  At that point, you say we

25  can show the tax returns and he's going to testify this is where

1   it came from.  At that point you've got the tax returns.

2          But what I'm trying to do is get us locked into what's

3   going to be the evidence of the business that he did.  Only as

4   much as is needed to show that and no more invasion into his

5   privacy than that.  So I'm trying -- I know he feels like he's

6   being needled.  I'm trying to avoid a needle.  If he's willing to

7   say this is it, I'm not going to let them get into the tax

8   records.

9          MR. MENHART:  Your Honor, I think I can solve this very

10  quickly.  It's already done.  We have produced what we have as far

11  as invoices.  It was clear in his deposition.  You know, this was

12  three months ago now.  We have produce it.  And so I think

13  that's -- without sort of going -- backtracking here, I think

14  that's part of the reason.  We don't think that's part of the

15  dispute here.

16         And, again, we're not going to show up -- we're not

17  going to Perry Mason this thing and show up at trial with 12

18  different invoices that we didn't disclose in discovery.  That's

19  not going to happen.  It's on the record right now.

20         So we have produced the invoices.  And in my opinion

21  this is a nonissue.  The evidence is what it is.  They have the

22  one or two invoices and they have the deposition testimony and a

23  variety of other things.  So there's just nothing else to give.

24  They're truly is nothing else to give and they don't have to worry

25  about us showing up at trial with something new because there's

1  nothing new.  And, again, I'm putting that on the record now.

2         THE COURT:  First, thanks for the Perry Mason allusion.

3  I understood that even though I don't understand Slack.  So

4  thanks.  But your point is well taken.

5         But let me say this to you.  And I think it's reflected

6  in the ongoing discovery they did.  Your position is you've

7  produced that.  It's there.  But it's produced in a mass of 4,500

8  pages that you contend is responsive to that request.  Which means

9  there has not been a delineation that these are the invoices and

10  this is it.  And that's what I'm asking for.  You know, that's why

11  I don't think it's overly burdensome.  If it's only a couple, it

12  takes you two minutes to dash it out, send it to them and we're

13  done with the invoices.  If there's something more than that, then

14  we've got it done.  But my understanding is that the problem is

15  it's been presented heretofore as a part of a bigger production.

16  And so here we break it out and see it.  So that's --

17         MR. MCLAUGHLIN:  And I agree.  And I think Your Honor's

18  ruling that defendant needs to supplement his interrogatory

19  responses will hopefully get us that.  Because that's the issue.

20  You can't have the interrogatory responses that we have with the

21  representations we just heard.  It can't be I have rendered

22  services in the last three years if I don't have a single invoice.

23  Then the interrogatory sworn response has to be I have not

24  rendered any services under the Nubank name in the last three

25  years, I'm not doing it currently.  I haven't done it in the last

1  ten years.  Then we have no issue.  It's just you can't have it

2  both ways.  So I think your order -- those need to be supplemented

3  will hopefully address that issue.

4        THE COURT:  I'm obviously not ruling what your answer

5  has to be.  You'll write your own answer.  But I think the point

6  is made that we get some definition to that.

7        And the key is it's not -- I'm not ruling on the merits

8  here.  But the key is what evidence is going to be used to rule on

9  the merits?  That's all I'm trying -- I'm trying to lock down

10  because I think we need that.

11        MR. MENHART:  Very briefly.

12        THE COURT:  Yes, sir.

13        MR. MENHART:  I do think that we will do the very best

14  that we can here based on what the Court is saying.  But just to

15  be perfectly clear to the Court, make sure there's no

16  misunderstandings here, we have nothing else.  We are going to

17  draft different responses.  Okay?  And we're going to try to

18  clarify based on what the Court is suggesting here.  But there's

19  not going to be any new production.  We have nothing else.  As

20  long as everyone in the courtroom appreciative of that, we can do

21  the best we can based on what the Court just explained.

22        THE COURT:  Quiet honestly that was my full expectation.

23  So whatever we see is going to come from what's already been

24  produced, but it will be more refined and directed specifically to

25  the things we're talking about here.

1        MR. MENHART:  Fair enough.

2        THE COURT:  Other matters from the defense side that you

3   think we need to address at this moment?

4        MR. MENHART:  You know, just very briefly.  You know,

5   there was this -- this filing of the -- let me try to do this

6   politely and quickly.  There were certain portions of the

7   defendant's deposition that was filed in violation of the

8   confidentiality order.  I just don't want it to happen anymore.

9   You know, my client wasn't thrilled about that and nor was I.  And

10  so, you know, that's something that we're concerned -- that we

11  were concerned about.  I don't know if there's really any ruling

12  about it.  I just wanted to make sure it's clear on the record.

13  It was improper.  It should not have happened.  That's all I have

14  to say about it.

15       THE COURT:  There was an explanation given in terms of

16  what transpired at the deposition about how confidential matters

17  were going to be handled.  Is that -- that's not your recollection

18  of the way that was --

19       MR. MENHART:  We had a great hearing.  I've tried to

20  keep it very positive.

21       [Interruption.]

22       MR. MENHART:  And I will try to make it very brief.

23       This is not a personal attack on Mr. McLaughlin or any

24  other counsel.  But there have been a lot of things here.  And,

25  look, I don't know what specifically happened.  Honestly, I think

1  part of this might be that the plaintiffs are telling the
2  attorneys to act very aggressively towards my client.  I think
3  that's almost certainly true.  Fine.  But, you know, we just want
4  the attorneys to please just be honest and accurate with the
5  things that they're saying.  And this is one example of a wide
6  variety of examples which is already in the pleadings and I'm not
7  going to recount them.  It's just a false statement.  It's just a
8  false statement.  And if they had any evidence that I would have
9  agreed to waive any part of the confidentiality order, they could
10 have cited the deposition transcript.  But there was nothing
11 there.

12         So, again, I don't want to be sour grapes here.  We just
13 want people to be honest with what's happened here and this has
14 happened a wide variety of times.  And I just want to make it
15 clear on the record the defendant objects to it.  And I personally
16 as a practicing attorney object to it.  And very bluntly, no other
17 counsel that I've worked against does this.  They just don't.  So
18 I don't want to be sour grapes and I will cut myself off right
19 here.  But it is -- it has been a concern.  I've raised the
20 concern with plaintiff's counsel.  Nothing has happened.  Now I'm
21 raising it with the Court.  And I'm not necessarily asking the
22 Court to do anything other than hear me, which I appreciate that
23 you're doing and put it on the record.  And I'm comfortable
24 leaving it at that.

25         MR. MCLAUGHLIN:  Can I respond briefly, Your Honor?

1          THE COURT:  Yes.

2          MR. MCLAUGHLIN:  We did quote.  We quoted verbatim from

3  the deposition transcript where in our view this was clearly dealt

4  with.  We specifically raised the issue of confidentiality

5  designations because Mr. Hudson invited a third party to the

6  deposition.  And it was reflected on the record that if there was

7  anything that Mr. Menhart viewed as confidential, he would ask

8  that third party to leave the room.  It didn't happen.  He put one

9  specific issue on the record as confidential.  And we of course

10  honored that.  We didn't cite to any portion of the transcript

11  that dealt with that.

12          So I don't understand this -- this claim that we're

13  somehow presenting false information to the Court.  We presented

14  exactly why we cited it.  And -- and frankly there's nothing -- I

15  don't think anybody could look at the portions that we cited and

16  say that there was anything confidential in there.  The only

17  testimony was whether or not Mr. Hudson filed a tax return or

18  prepared taxes.  There's nothing confidential in anything that we

19  cited.  And we had an agreement -- and the confidentiality order

20  has that specific provision in it that if the parties put on the

21  record a different take, that's how we will proceed.

22          THE COURT:  Let me just say this, as I said earlier,

23  having read that, and there were a couple matters that were

24  mentioned in regard to the surreply on the motion to compel by the

25  defendant that I felt satisfied that did not require the Court's

1  attention.  And the quoted portion from the deposition is what
2  caused me to take that position with regard to that.  It's not a
3  ruling one way or the other.  Certainly my expectation is that
4  counsel will honor designations of confidentiality.  That is the
5  expectation.

6        I'm sometimes accused of being optimistic.  And I don't
7  want to be so to the extent of being totally naive.  But I prefer
8  to presume the best about everyone until they prove to me I can't
9  and then I'm willing to not.

10       But my assumption is based on what I read there that
11  there was not an intentional overt effort.  And particularly when
12  I look at the nature of the evidence that came out, was not
13  particularly harmful, it did not seem.  I could understand,
14  however, that the person had a protection of confidentiality but
15  there would be some concerns about that.

16       That being said -- this may not be appropriate but the
17  great thing about being a senior judge, it doesn't really matter.
18  So I'm going to ask you guys to really search within yourselves a
19  little bit before you go to mediation -- and I am going to send
20  you to mediation because we have noted among my staff.  I mean,
21  it's not me.  I mean, my staff has seen the animosity that is
22  here.  And I don't know where the blame lies.  I really don't care
23  because that's not my job is it assign blame.  My job is to
24  resolve disputes.

25       And the way we're going to resolve this dispute is going

1   into a room and with two people desiring to see resolution, and

2   going in with an open mind, not throwing spears and casting

3   stones.  But going in and trying to resolve this where both

4   parties come out in a better place.  And, guys, there's a way that

5   can be done here.  And it just really troubles me that we are

6   going to spin wheels, spend the money and take up time on a matter

7   that could be resolved, I think, very easily.  But you guys are

8   going to have a lot to do with whether that happens or not.

9           If you go back and tell your clients they're still jerks

10  on the other side and they just found another way to jerk us

11  around and now the Judge is going to make us go through a

12  mediation that's meaningless, and you're going have to spend more

13  money to do that, we won't settle it.

14          You come back.  I'll rule.  We'll have a trial.  We'll

15  spend some more money.  Everybody will leave because what it would

16  cost them to get where they are, regardless of where that ends up

17  being.  And we can have people leave here -- which this does

18  matter to me -- having a sense that justice has been served.  That

19  they've gotten -- it's not as bad as it could have been.  They

20  didn't get everything they wanted.  This matter's resolved.  My

21  God, if this man's been dealing with this eight years being

22  needled, just a little peace might be worth something.

23          Where does that work into the equation?  A good

24  counselor would advise him of that.  Man, you could put this

25  behind you.  You could enjoy your senior status.  You don't have

 1  to worry about these guys anymore.  Put them in your rearview
 2  mirror.  Don't worry about it.  For you guys, hey, this may be
 3  more than you're wanting to spend.  Do you want to spin these
 4  wheels?  Do your business.  Be able to do your work, not worry
 5  about Mr. Hudson out there.
 6              I'm sorry I'm talking so fast.
 7              But that's -- come on, guys, get on board with this.
 8  I'm just asking you, give us your best shot, a good faith effort.
 9  I'm going hole -- I'm going to issue an order.  But I'm going to
10  hold it back until you have had a chance to go to mediation,
11  because I believe that strongly this case would be settled.  And
12  I'm not -- I'm not a guy that stands on lawyers to settle their
13  cases.  I promise you I'm not.  You can ask around.  You guys
14  haven't had cases with me before.  I don't do that.  But this is
15  one where -- I have never met Mr. Hudson, but I want the man to
16  have peace.  You know, I want your guys to be able to do business.
17  You know, run their business, have success.  Everybody leaves
18  happy.  Wow, wouldn't that be nice.
19              Thank you, gentlemen.  I appreciate it.
20              MR. MENHART:  Thank you, Your Honor.
21              MR. MCLAUGHLIN:  Thank you, Your Honor.
22              MR. ANDREWS:  Thank you, Your Honor.
23              THE DEPUTY:  All rise.  Court's in recess.
24              (Proceedings were concluded at 11:13 a.m.)
25

1          Reporter's Certification

2    I certify that the foregoing is a correct transcript from the

3    record of proceedings in the above-entitled matter.

4

5                                    /S/Denise M. Stewart, RPR
6                                    Official Court reporter
                                     United States District Court
7                                    Northern District of Georgia

8    Date:  March 6, 2022

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25